Carol Falk **LOPACICH,**
**Plaintiff–Appellant,**

v.

**Ralph FALK II, Defendant–Appellee.**

**No. 92–2775.**

United States Court of Appeals,
Seventh Circuit.

Argued June 9, 1993.

Decided Sept. 13, 1993.

Rehearing Denied Oct. 12, 1993.

Paul D. Weatherhead, John A. Cook, Hough, Cook, Weatherhead & Kinsella, David M. Levin, John W. Hough (argued), Hough & Cook, Chicago, IL, for plaintiff-appellant.

Lee A. Watson (argued), Jaye Quadrozzi, Melvin E. Katten, Katten, Muchin & Zavis, Chicago, IL, for defendant-appellee.

Before CUMMINGS, FLAUM and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

■ Carol Falk Lopacich is suing her brother, Ralph Falk II, for sabotaging her efforts to reconcile with their mother after thirty years of silence and more than sixty years of hostility and disdain. Summary judgment was entered for defendant. It should be stressed that defendant vehemently disputes his sister's version of the facts. We dispose of the case in defendant's favor

because even if the facts asserted by plaintiff actually occurred, she has no remedy under Illinois law which applies to this case. It cannot be overemphasized that this Court is not choosing between the two contestants' contrary versions of the circumstances. While Falk's view of the facts may have merit, in considering the grant of summary judgment against his sister, we are compelled to view the facts in her favor. *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991).

The rift between Carol Lopacich and her family began in her childhood when, at about the age of eight, she became addicted to sweets; to feed her habit she would filch money from household servants and from her parents. The child's sweet tooth and her consequential obesity—eventually, she would weigh 340 pounds—embarrassed her socially active parents, Marian and Ralph Falk. Ralph Falk was a surgeon who helped found what became Baxter International, Inc., possibly the largest hospital supplier in the United States and a pioneer in the mass production of intravenous fluids. In a daily family ritual, Marian would hoist her daughter onto the scales each evening and then scold her for her eating habits, which included sneaking into the kitchen before the help was awake to supplement the otherwise bird-like portions she received at meal times. The young Carol began running away from home to avoid the scales and at age fourteen her parents shipped her off to the Annie Wright School in Tacoma, Washington, described in newspaper articles as a "fat farm." She ran away from there too and was found living with a man. Her parents placed her in facilities for disturbed children and in a mental institution. Finally she enrolled at the Bergholz Health Institute in Milwaukee and learned to be a masseuse; this is how she supported herself until age 57 when she had to retire because of a disability. She wed four times, each marriage ending in divorce, and had one child with her first husband.

Carol's father wrote in a letter that neither he nor his wife loved her, and the mother, Marian Falk, is said to have denied even having a daughter. One Mother's Day, Carol called Marian Falk so that her son could play

the violin for his grandmother, but Marian cut him off in the middle to ask Carol what she weighed. Yet before the time Marian Falk died in 1990, plaintiff had decided to end the estrangement; she had dieted down to 145 pounds and wanted to prove to her mother that "she finally had a thin daughter" (plaintiff's brief at 37). According to this suit, she was prevented from doing so by her brother, Ralph Falk II. Unlike his sister, Falk was of normal weight and quite prosperous. He attended Culver Military Academy, Dartmouth College and the University of Michigan where he received an M.B.A. Falk succeeded his father as chairman of Baxter Healthcare Corp. (as it is now known) and retired in 1980.

Mrs. Lopacich inherited only $100 from her father's $10 million estate at his death in 1960. When Marian Falk died in 1990, she left an estate in excess of $50 million but she bequeathed nothing to her daughter. The only family money Carol Lopacich receives is from a 1944 trust which included 3,000 shares of Baxter stock. Trustees sold the stock in favor of "safer" investments and the trust is currently worth between $212,000 and $272,000. Had they simply retained the Baxter stock, Mrs. Lopacich's trust would now be valued at about $16 million.

Plaintiff brings two claims against her brother, both equally far-fetched: that he intentionally subjected her to extreme emotional distress by preventing her from visiting their mother, and that he owed her a fiduciary duty to convince Marian Falk to bestow gifts equally between them. She asked the district court to salve her suffering with an award of $37.5 million. A magistrate judge granted Falk's motion for summary judgment and Judge Plunkett ratified that decision. Despite her tale of familial rejection, Mrs. Lopacich fails to make out the elements of a tort claim, and therefore the district court's decision must be affirmed.

By July of 1988 when plaintiff first attempted to reestablish contact with her mother, Marian was ninety-three, frail and unable to continue living alone. Thus Ralph Falk had moved her from her final Chicago residence at the Drake Hotel in Chicago to his home in Lake Forest, where she received

round-the-clock nursing care. Mrs. Lopacich came to Chicago that July to inquire about her mother's new circumstances, but Magistrate Judge Bobrick doubted that was the real reason for her trip. In any event, after a conversation with an elevator operator at the Drake who had befriended Marian Falk, Mrs. Lopacich tried to phone her mother three times on July 1, 1988 at Ralph's home. The third time she reached her mother's nurse who said that Ralph had prohibited Marian from taking her daughter's calls. Mrs. Lopacich showed up at Ralph's house the next day accompanied by one of Ralph's ex-wives, Janet Falk, and they were denied entry; Ralph claims this was due to the presence of his former spouse, with whom he was engaged in a bitter custody dispute concerning their fourteen-year-old daughter. Mrs. Lopacich tried to call Marian Falk several more times—the parties dispute how often—but never got through, presumably because the elderly woman was asleep or indisposed. Finally, Mrs. Lopacich filed suit in Lake County, Illinois, and won an order restraining Ralph Falk from preventing mother and daughter from meeting "in a normal and reasonable manner" (plaintiff's app. at 6). When Mrs. Lopacich tried to arrange such a meeting, she was told by a secretary in the office of Ralph Falk's attorney that the police would be called if she showed up at his house. After Mrs. Lopacich filed an emergency motion seeking a contempt order against Falk, the parties agreed that she could visit Marian outside Ralph's home in the fall of 1989. They did so twice. But the reunion of mother and then thin daughter was not what Mrs. Lopacich had hoped for, and after one encounter Ralph sent his sister a note saying that the frail woman had not even recognized her.

Ralph Falk tried to have himself appointed as guardian of Marian Falk's estate and person, but Mrs. Lopacich thwarted the move and Continental Bank was named instead. She tried to schedule more visits. Falk refused. She brought him back to court. The court scheduled several visits between mother and daughter in the presence of a guardian, and one unsupervised visit in Falk's home. These came off without incident although Ralph Falk refused to allow plaintiff's

son to enter his house. Carol Lopacich canceled two other visits with her mother in late 1990. Marian Falk died at the end of December 1990; she did not mention plaintiff in her will.

■ Because this case was brought under diversity jurisdiction, we apply the substantive law of Illinois. To make out a claim of intentional infliction of emotional distress, the plaintiff must prove three things: that the conduct was extreme and outrageous, that the actor intended or knew that the conduct would inflict severe emotional distress, and that the conduct did in fact cause such distress. *McGrath v. Fahey*, 126 Ill.2d 78, 86, 127 Ill.Dec. 724, 533 N.E.2d 806 (1988). The tort does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Restatement (Second) of Torts § 46, comment *d*, at 73 (1965). It is appropriate to consider the power and influence wielded by the harassing party, *Milton v. Illinois Bell Telephone Co.*, 101 Ill.App.3d 75, 79, 56 Ill.Dec. 497, 427 N.E.2d 829 (1st Dist.1981); *Eckenrode v. Life of America Insurance Co.*, 470 F.2d 1, 4 (7th Cir.1972), the likelihood that the threatened action could be carried out, *Plocar v. Dunkin' Donuts of America, Inc.*, 103 Ill.App.3d 740, 747, 59 Ill.Dec. 418, 431 N.E.2d 1175 (1st Dist.1981), the legitimate reasons one might have for making the offensive statements, *Gibson v. Chemical Card Service Corp.*, 157 Ill.App.3d 211, 219, 109 Ill.Dec. 416, 510 N.E.2d 37 (1st Dist.1987), and the defendant's awareness of the plaintiff's susceptibility to physical or mental stress. *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 94, 4 Ill.Dec. 652, 360 N.E.2d 765 (1976). Magistrate Judge Bobrick concluded tentatively that Ralph Falk's conduct was neither intentional nor extreme and outrageous, and that he certainly did not cause his sister the kind of severe trauma necessary for a tort claim to be sustained.

Ralph Falk may have known his behavior would cause emotional harm to his sister, although it is possible that he might have thought preventing a mother-daughter reunion would spare the plaintiff further angst. But in any event Falk's actions were not extreme and outrageous, did not cause Mrs.

Lopacich severe emotional trauma, and could not support an intentional infliction of emotional distress tort. Falk's first offense, according to Lopacich, was in directing his staff to deny her entry to his home on July 2, 1988, so that she could not visit her mother. But Mrs. Lopacich had shown up unannounced and escorted by one of Falk's ex-wives—hardly a gesture of conciliation—and turning her away on this occasion therefore does not seem unduly harsh. Next he arguably prevented Marian Falk from taking a handful of Mrs. Lopacich's phone calls over the course of a year, but he claims that the ninety-three-year old woman was napping during these calls and there is no evidence to the contrary. Since Illinois law does not require a bystander to rescue a drowning child, see *Traudt v. City of Chicago*, 98 Ill. App.2d 417, 423, 240 N.E.2d 188 (1st Dist. 1968), it surely does not mandate that a brother take it upon himself to foster a rapprochement between family members. While defendant did impel Carol Lopacich to enforce her visitation rights via court action, considering the circumstances that probably does not exceed all bounds of decency either. *Rudis v. National College of Education*, 191 Ill.App.3d 1009, 1012, 139 Ill.Dec. 89, 91, 548 N.E.2d 474, 476 (1st Dist.1989).

More to the point, Carol Lopacich got to visit with her mother despite the obstacles allegedly erected by Ralph Falk. It is hardly conceivable that Mrs. Lopacich could have suffered severe emotional trauma from defendant's not letting her visit her mother when, after all, she did see Marian on numerous occasions. The psychiatric reports in the record do suggest that Lopacich suffered extreme emotional trauma—but at the hands of her mother, not her brother, and beginning well before 1988. Although Ralph Falk might have contributed to this life-long pathology in some way by trying to keep mother and daughter apart, as the magistrate

judge pointed out, his role was legally insufficient to be the proximate cause of her injuries. *Kelso v. Watson*, 204 Ill.App.3d 727, 730, 150 Ill.Dec. 172, 174, 562 N.E.2d 975, 977 (3d Dist.1990), appeal denied, 137 Ill.2d 665, 156 Ill.Dec. 562, 571 N.E.2d 149 (1991).

 Carol Lopacich's next claim is that Falk owed her some sort of fiduciary duty to convince their mother to give Carol money. In order to establish evidence of a fiduciary relationship, the plaintiff must show that she reposed confidence in the defendant and that he had influence and superiority over her. *In re Estate of Rothenberg*, 176 Ill.App.3d 176, 180–181, 125 Ill.Dec. 739, 742, 530 N.E.2d 1148, 1151 (1st Dist.1988). The mere fact that Falk is related to Mrs. Lopacich does not by itself create a fiduciary relationship. *Perry v. Wyeth*, 25 Ill.2d 250, 253, 184 N.E.2d 861 (1962). In discerning the existence of a fiduciary relationship, it is appropriate to consider disparities of age, health, mental condition, education, and the trust the subservient person has put in the dominant party. *In re Estate of Henke*, 203 Ill.App.3d 975, 981, 149 Ill.Dec. 36, 561 N.E.2d 314 (5th Dist.1990). Falk must have seemed a powerful figure to his sister. But he could not have had a fiduciary relationship with her because they basically had no relationship at all—they hardly spoke in thirty years. It is true that Ralph Falk II succeeded his father as trustee of Carol's trust. (Continental Bank handled the trust's investments through an investment agency account.) But he resigned at plaintiff's request in 1985; in return, she executed a document releasing her brother from all liability for his actions as trustee.[1] After that he handled none of her business affairs. Thus while Ralph Falk might have had some fiduciary responsibility to his ailing mother, he had no responsibility to Carol Lopacich at the time of these events. His only influence over Carol's finances came

---

1. Carol Lopacich now challenges the validity of this document on the ground that Falk committed constructive fraud in not telling her about gifts he received from their mother. But the fiduciary's responsibility to disclose encompasses material facts relating only to the trust itself. *Obermaier v. Obermaier*, 128 Ill.App.3d 602, 607, 83 Ill.Dec. 627, 470 N.E.2d 1047 (1st Dist.1984). Falk's relationship with his mother was not material to his oversight of a trust with fixed assets that had been established for Carol by their father forty years before. It is, of course, possible to imagine a situation where a trustee receives gifts that might otherwise be intended for the beneficiary, but there is nothing in this record to suggest that Marian Falk would have given her daughter any of the money that ultimately went to her son.

214

indirectly through their mother, but if anything in this record is clear, it is that Marian Falk long ago decided of her own accord to shun her daughter. Perhaps Ralph Falk could have prevailed on his mother to reconsider her disdain of Carol, but the law imposes no such duty and, without a fiduciary relationship, we can have no expectation that Ralph Falk would act against his own interests.

Plaintiff poses a few other arguments, none of which have merit. She contends that the district court erred in not admitting a physician's testimony that had not been presented to the magistrate judge, but the plaintiff's brief concedes that the doctor's report offers no new evidence. Mrs. Lopacich also claims that the magistrate and district judge erred in making factual conclusions about the evidence which should have been reserved for trial and that, as a result, summary judgment was inappropriate. However, the items she points to as being questions for trial are irrelevant at best. For example, Mrs. Lopacich faults the magistrate judge for stating that the 3,000 shares of Baxter stock in the 1944 trust were in Carol's name alone, when they might have been in a voting trust. And she claims that he also erred in suggesting that Marian move to Ralph Falk's home when technically Marian owned a piece of it herself because her trust had helped buy the house. But it is difficult to see how such fine distinctions should alter the outcome of this case.

Carol Falk Lopacich claims to have suffered at the hands of her family. Her remedy, however, is not to be found in a tort suit for intentional infliction of emotional distress and breach of fiduciary duty. Therefore, the judgment of the district court is affirmed.