In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3535

United States of America,

Plaintiff-Appellee,

v.

Wieslaw Mietus,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 386--George M. Marovich, Judge.

Argued October 25, 2000--Decided January 22, 2001

Before Coffey, Diane P. Wood, and Williams, Circuit Judges.

Diane P. Wood, Circuit Judge.  Wieslaw Mietus was tried along with two co-defendants on one count of conspiracy to distribute marijuana, in violation of 21 U.S.C. sec. 846, and one count of possession with intent to distribute marijuana, in violation of 21 U.S.C. sec. 841(a)(1). The jury found the two co-defendants not guilty on the substantive count and failed to reach a verdict as to either of the co-defendants on the conspiracy count. Mietus was not so lucky; it convicted him on both counts, and the court sentenced him to 151 months imprisonment followed by 5 years of supervised release. In this appeal, Mietus challenges his conviction on various grounds and, in the alternative, requests that the case be remanded for resentencing in light of the U.S. Supreme Court's decision in Apprendi v. New Jersey, 120 S. Ct. 2348 (2000). For the reasons that follow, we affirm both the conviction and the sentence.

I

On May 24, 1998, Krystian Gut was driving a tractor-trailer owned by Mietus from El Paso to Chicago when he was stopped at a border control checkpoint in Alamogordo, New Mexico, about 90 miles north of El Paso. He gave the border agents permission to search the trailer, and they found,

along with a load of cantaloupes, 33 boxes containing approximately 2,300 pounds of marijuana. Caught red-handed, Gut agreed to cooperate with the government and to deliver the truck to Chicago as planned. On the way to Chicago, Gut made several recorded calls to Mietus, during which Gut reported that the truck's refrigeration unit was broken and also told Mietus that he was carrying "2300 pounds" of something. Gut met Mietus and Andy Chrobak, one of Mietus's co-defendants at trial, at a truck stop; from there, Mietus and Chrobak drove the truck to a small truck-repair garage. Mietus had asked the third defendant, Janusz Szarflarski, to meet them at the garage. According to Mietus, he was concerned that the refrigeration problem would allow the cantaloupes to spoil, and he wanted Szarflarski and Chrobak to help him fix the problem.

When they arrived at the garage at about 9 p.m. on Memorial Day, Mietus asked Szarflarski and Chrobak to help him "arrange" the small boxes that were wedged between the cantaloupe boxes. The three men spent about an hour unloading the boxes of marijuana; none of the cantaloupe boxes was moved, although some may have been trampled. At that point, Mietus went outside, where waiting DEA agents arrested him. The agents then entered the garage and found Szarflarski and Chrobak still busily unloading the boxes. The agents detected a strong odor of marijuana in the warehouse and noticed that one of the marijuana boxes that had been unloaded was broken, spilling some bundles of marijuana onto the floor of the warehouse. The doors to the refrigeration unit were closed, and there were no tools near the unit. After a moment's observation, the agents arrested Szarflarski and Chrobak.

The arrests were later followed with an indictment charging Mietus, Szarflarski, Chrobak, and Gut with conspiracy to distribute marijuana and possession with intent to distribute marijuana. Mietus, Szarflarski, and Chrobak went to trial together; Gut entered into a plea agreement and testified for the government at the trial. As noted above, the jury acquitted Szarflarski and Chrobak on the substantive charge and failed to reach a verdict as to them on the conspiracy charge, but it convicted Mietus on both.

II

After his conviction, Mietus moved for a new trial on two grounds. First, he argued that the prosecutor improperly called the jury's attention to Mietus's failure to testify, in violation of his Fifth Amendment rights. Second, he argued

that statements made by Chrobak's lawyer in closing deprived Mietus of a fair trial. The district court denied the new trial motion, and Mietus has appealed from that ruling.

This court reviews a district court's decision not to grant a new trial for abuse of discretion. If the court's decision rests on an error of law, however, then it is clear that an abuse of discretion has occurred, as it is always an abuse of discretion to base a decision on an incorrect view of the law. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990). And, of course, our review of this type of underlying legal ruling is non-deferential.

In evaluating whether a prosecutor's comments denied a defendant a fair trial, we look at them first in isolation to determine whether they stayed within proper bounds. United States v. Cotnam, 88 F.3d 487, 498 (7th Cir. 1996). If not, the next step in the analysis depends on whether the impropriety violated one of the defendant's specific trial rights, such as the Fifth Amendment right against self-incrimination, or whether it reflected more general prosecutorial misconduct, such as vouching for the credibility of a witness or misstating evidence, which could deprive the defendant of her due process right to a fair trial. Id. If the defendant's challenge is to general prosecutorial misconduct, then, after determining that the remarks were improper, the court should consider the remarks in light of the entire record to determine if the defendant was deprived of a fair trial; that is, the court should determine "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986). If the improper remarks violated a specific trial right, then a more stringent standard of review applies. In such a case, the court may hold the error harmless and uphold the conviction only if the government proves beyond a reasonable doubt that the defendant would have been convicted absent the unconstitutional prosecutorial comments. Cotnam, 88 F.3d at 500.

In this case, Mietus argues that the prosecutor's statements during closing violated his Fifth Amendment right against self-incrimination, and thus we use the framework for analyzing specific constitutional errors. We note that this does not appear to be the approach the district court took. Instead, it assumed arguendo that the prosecutor's comments were improper and denied the new trial motion on the ground that the prosecutor's statements did not "infect the trial with unfairness to such a degree as to make Mietus's conviction a denial of due process."

Failure to apply the "harmless beyond a reasonable doubt" standard applicable to denials of specific trial rights was a legal error, but it is one that makes no difference to the outcome here. That is because the statements Mietus challenges were not improper to begin with. Furthermore, even if they were, we are convinced beyond a reasonable doubt that Mietus would have been convicted even had they never been uttered.

We turn first to the statements Mietus challenges. In his closing argument, the prosecutor said:

Ladies and gentlemen, my guess is you are familiar with the phrase, "actions speak louder than words." Talk is cheap, particularly talk nine years--nine months after the fact. Actions tell us what's really going on. They demonstrate what's really in a person's mind, and that's why we have that phrase, "actions speak louder than words."

We've heard a lot of words, a lot of talk during this trial, through the opening statements, through the questions, even to Mr. Szarflarski's testimony. The defendants have told you what they want you to believe about their knowledge. . . .

What do their actions tell us? On May 25, 1998, Memorial Day night, a holiday, did they rush to a warehouse in West Chicago, pull a tractor in and begin unloading cantaloupes on to another truck to make sure those cantaloupes got to the market fresh? I didn't hear any evidence about that.

On May 25th, did they rush to a repair place in West Chicago and did Mr. Szarflarski and Mr. Chrobak and Mr. Mietus immediately begin working on a refrigerator unit to keep the temperature correct so they could get the produce to the market? No; we didn't hear any testimony about that.

The Fifth Amendment forbids prosecutors from inviting the jury to draw an adverse inference from a defendant's decision not to testify. Griffin v. California, 380 U.S. 609 (1965). This rule prohibits indirect as well as direct comments to this effect. United States v. Aldaco, 201 F.3d 979, 987 (7th Cir. 2000). Nevertheless, indirect requests to draw adverse inferences from the defendant's silence violate the Fifth Amendment only if (1) the prosecutor manifestly intended to refer to the defendant's silence or (2) a jury would naturally and necessarily take the remark for a comment on the defendant's silence. United States v. Butler, 71 F.3d 243,

254 (7th Cir. 1995). A prosecutor's comment that the government's evidence is uncontradicted or unrebutted will violate this rule if the only person who could have rebutted the evidence was the defendant. Aldaco, 201 F.3d at 987. In considering whether a prosecutorial statement violated a defendant's Fifth Amendment rights, the statement should be analyzed in context. See United States ex rel. Lee v. Flannigan, 884 F.2d 945, 954 (7th Cir. 1989).

Mietus first takes issue with the prosecutor's statement that "the defendants have told you what they want you to believe about their knowledge" and with the prosecutor's reference to Szarflarski's testimony. These statements, Mietus contends, indirectly highlighted his failure to take the stand by inviting the jury to consider what Mietus told them, which, since Mietus did not testify, was nothing. But it is plain from the statements themselves that if they referred at all to his decision not to testify, they did so only indirectly. That means they were impermissible only if they were "manifestly intended or [were] of such character that the jury would naturally and necessarily take [them] to be a comment on the failure of the accused to testify." Butler, 71 F.3d at 254.

Viewed in context, the statements had no such necessary meaning. Instead, they merely referred to what the defendants, through their lawyers and through Szarflarski's testimony, had argued during the trial. The thrust of the prosecutor's argument was that the defense team's "words" were not consistent with the evidence of the defendants' actions. The statements did not draw the jury's attention to anything Mietus himself did or did not say; rather, they referred to the "words" of Szarflarski and of the defendants' counsel. To the extent that the statements referred to Szarflarski's testimony, they can be seen as simple commentary on the evidence. The statements were not manifestly intended to suggest that Mietus's silence was evidence of his guilt, nor would a jury naturally and necessarily take them that way.

Mietus also challenges the prosecutor's remark that "we didn't hear any testimony" that the defendants rushed to repair the refrigeration unit as soon as they arrived at the garage. Mietus argues that this statement was impermissible because the only people who could possibly have provided testimony about what the defendants did when they got to the garage were the defendants themselves. See Aldaco, 201 F.3d at 987. But defendant Szarflarski did testify. He could have provided testimony about what happened at the garage, but he did not. This court has

held that where an accomplice could have provided testimony to rebut a part of the government's case, the prosecutor's statement that that evidence was unrebutted would not be taken as an impermissible comment on the defendant's silence. Aldaco, 201 F.3d at 988; Butler, 71 F.3d at 255. Similarly, the arresting officers saw at least some of what went on in the garage, and this court has held that a reference to unrebutted testimony is not improper where police officers present at the arrest could have contradicted the government's theory. Butler, 71 F.3d at 255. Mietus was far from the only person who could have testified as to what actions the men took when they got to the garage, which leads to the conclusion that the prosecutor's remark about the lack of testimony indicating that they immediately tried to repair the refrigeration unit did not violate Mietus's Fifth Amendment rights.

Even if, for the sake of argument, we indulged the assumption that the closing statement might have amounted to an impermissible comment on Mietus's failure to testify, we have no trouble finding here that any error connected with it was harmless beyond a reasonable doubt. The government caught Mietus, Chrobak, and Szarflarski in the act of unloading 2,300 pounds of marijuana from a truck that Mietus owned. The only real issue in the case was which of the men knew that the boxes contained marijuana. On that point, the government offered Gut's testimony that Mietus arranged the pickup of the marijuana in Texas and hired Gut to drive it back to Chicago. Gut made tapes of conversations he had with Mietus; although the tapes apparently weren't entirely intelligible, there were references to "2300 pounds" in one of the conversations. Government agents testified that, when Mietus and the other men arrived at the garage with the truck, they did not attempt to unload any of the cantaloupes, but went straight for the boxes of marijuana. A government agent also testified that at least some of the boxes were ripped and that there were bundles of marijuana lying on the floor of the garage when Mietus was arrested. The same agents testified that there was a strong odor of marijuana in the garage while Mietus and the others were unloading the truck.

To this, Mietus responds only that the government's supposedly powerful case actually rested principally on the uncorroborated testimony of Gut, who had a strong motive to lie to lower his own sentence. Even if that were true, it would be unpersuasive, given the jury's prerogative to decide credibility questions. But it is not; there was substantial evidence of

Mietus's actions after Gut delivered the truck to him. Many of the details of Gut's testimony were also corroborated with circumstantial evidence such as records of phone calls between Gut and Mietus and documents that established that Gut and Mietus had traveled to Texas together at the times Gut said they did.

Finally, Mietus argues that the evidence of what happened in the garage, without the testimony of Gut, must have been insufficient to convict him, because the jury acquitted Szarflarski and Chrobak. But the jury was fully within its proper right to acquit some defendants and to convict another. Indeed, we do not even reverse convictions if juries return inconsistent verdicts for a single defendant. See United States v. Powell, 469 U.S. 57, 64-66 (1984). Here, the jury rationally could have seen Mietus's role in a different light from that of the others. Mietus was the one who picked up the truck from Gut and drove it to the garage; Mietus was the one who called Chrobak and Szarflarski and asked them to meet him. The jury might have thought that Szarflarski and Chrobak were merely taking orders from Mietus, or even that they were not aware that it was marijuana they were unloading. That same evidence indicated that Mietus was running the operation and was aware of what was going on. Viewed in the proper light, the evidence against Mietus was indeed overwhelming, and thus, even if the prosecutor's remarks strayed over the line, any error was harmless.

Mietus next argues that he was entitled to a new trial because statements Chrobak's attorney made in his closing unfairly prejudiced Mietus and denied him the opportunity for separate consideration of the charges against him. Chrobak's main defense was that even if there was a conspiracy he was not a part of it; he was just a laborer taking orders from his boss, Mietus. In closing, Chrobak's lawyer pointed to an instance when Gut and Mietus apparently tried to hide their association from Chrobak as evidence that Chrobak must not have been in on the conspiracy. Mietus argues that this line of defense unfairly prejudiced Mietus's ability to argue that any conspiracy must have been between Gut and unknown third parties. The district court also denied Mietus's motion for a new trial on this ground; our review is for abuse of discretion. United States v. Irorere, 228 F.3d 816, 829 (7th Cir. 2000).

There is a preference in the federal system for joint trials of defendants who are indicted together. A district court should grant a severance (or a new trial for one of the

defendants) only if the joint trial "compromise[d] a specific trial right of one of the defendants, or prevent[ed] the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 538-39 (1993). Even a showing that two defendants have "mutually antagonistic defenses," that is, that the jury's acceptance of one defense precludes any possibility of acquittal for the other defendant, is not sufficient grounds to require a severance unless the defendant also shows prejudice to some specific trial right. Zafiro, 506 U.S. at 538; United States v. Dimas, 3 F.3d 1015, 1020 (7th Cir. 1993).

In this case, Mietus cannot show that his and Chrobak's defenses were mutually antagonistic, much less that Chrobak's defense interfered with one of Mietus's specific trial rights. Chrobak's defense was essentially that even if there was a conspiracy, there was no evidence that Chrobak was involved or that he knew what was in the boxes. Chrobak's attorney did not focus on Mietus's role in the conspiracy or try to persuade the jury that Mietus must have been part of the conspiracy. In fact, in the portion of Chrobak's closing statement to which Mietus objects most strenuously, Chrobak's attorney did not even mention Mietus by name. Chrobak's closing statement focused instead on Chrobak's limited role in the events and his lack of knowledge of what was in the boxes. The jury could have believed Chrobak's defense that Chrobak was unaware of what was going on and also accepted Mietus's defense that, if there was a conspiracy, it was between Gut and unknown third parties. Because this is so, Chrobak's and Mietus's defenses were not so antagonistic that a new trial was required.

Mietus nevertheless argues that his specific trial rights were infringed because Chrobak's attorney implicated Mietus in the conspiracy in his closing statement at a time when Mietus had no opportunity to rebut Chrobak's accusations. According to Mietus, this violated his rights because it made Chrobak's attorney "functionally a second prosecutor." But the case on which Mietus relies, United States v. Romanello, 726 F.2d 173 (5th Cir. 1984), was decided before Zafiro, and we are not convinced that Romanello's holding that prejudice in a joint trial can be shown when one defendant strongly attacks another survives Zafiro. There is no specific trial right, in the sense the Zafiro Court used the term, not to have a co-defendant give damaging testimony. In any event, unlike the situation in Romanello, where the court thought that the co-defendant's lawyer was effectively an extra

prosecutor, here Chrobak's attorney made no particular effort to prove that Mietus or anyone else was part of the conspiracy. He wanted only to suggest that if a conspiracy existed, his client had no part in it. Because Mietus has shown neither prejudice to any of his specific trial rights nor the risk of an unreliable judgment, he was not entitled to a new trial.

III

Mietus's final argument is that, in the event his conviction is affirmed, his case should be remanded for resentencing in light of the U.S. Supreme Court's recent decision in Apprendi v. New Jersey, 120 S. Ct. 2348 (2000). In Apprendi, the Court held that factual findings that raise a defendant's sentence above the statutory maximum for the crime for which he is convicted must be considered elements of the offense rather than sentencing factors, and accordingly must be charged in the indictment and proved at trial beyond a reasonable doubt. 120 S. Ct. at 2362-63. We have recently held that in drug cases under 21 U.S.C. sec.sec. 841 and 846, before a defendant can be sentenced to a term of imprisonment above the default statutory maximum provided in sec. 841(b)(1)(C) or (D), Apprendi requires that a drug type and amount sufficient to trigger the higher statutory maximums of sec. 841(b)(1)(A) or (B) be charged in the indictment and found by the jury. See United States v. Nance, No. 00-1836, 2000 WL 1880629 (7th Cir. Dec. 29, 2000).

Mietus was sentenced to 151 months imprisonment, or 12 years and 7 months, for possession of marijuana under 21 U.S.C. sec. 841; the default statutory maximum sentence for possession of an unspecified amount of marijuana is 5 years. 21 U.S.C. sec. 841(b)(1)(D). Before a defendant can be sentenced to between 5 and 40 years, he must be found to have possessed at least 50 kilograms of a substance containing a measurable amount of marijuana. 21 U.S.C. sec. 841(b)(1)(B). The indictment against Mietus charged him with a conspiracy that involved transporting two loads of marijuana, one of approximately 2,500 pounds (1,134 kg) and one of approximately 2,300 pounds (998 kg), and with possession of approximately 1,000 kilograms of marijuana. All these amounts were well above the 50 kilograms needed to trigger sec. 841(b)(1)(B)'s heightened statutory maximum sentence, and thus the indictment complied with the requirements of Apprendi. The jury instructions are another matter. They did not require the jury to find that Mietus possessed or conspired to possess any specific amount of marijuana; rather, (in keeping with accepted law at the time) they told the jury that it could convict Mietus if it found that he

possessed and conspired to possess a "measurable amount" of marijuana. This instruction was inadequate under Apprendi to allow the district court to sentence Mietus to between 5 and 40 years imprisonment under sec. 841(b)(1)(B); therefore, imposing a sentence greater than 5 years on a conviction based on this jury instruction was error.

As was the case in Nance, however, the fact that the jury instructions and sentence imposed in this case did not comply with the requirements of Apprendi does not end our analysis of this issue. The Supreme Court has held that errors in jury instructions are subject to harmless error analysis, Neder v. United States, 527 U.S. 1 (1999), and this court has held that this rule applies to Apprendi errors. See Nance, supra. Moreover, although Apprendi was not decided until June 26, 2000, which was after Mietus filed his original brief but before he filed his reply brief in this appeal, the argument that factual findings that increase a defendant's sentence above the statutory maximum must be treated as elements of the offense was available to defendants well before that date. Just a few days after Mietus was convicted and before Mietus's sentencing hearing, the Supreme Court handed down its decision in Jones v. United States, 526 U.S. 227 (1999), which (as we explained in Nance) put the issue of the distinction between sentencing factors and offense elements squarely on the table. Mietus never raised this argument with the trial court, and did not raise it in this court until a mere five days before oral argument was set, when he filed a motion to stay these proceedings and remand the case to the district court for resentencing. At that time, this court denied the motion but agreed to treat the motion and the government's response as supplemental briefs on appeal. We conclude that, just as in Nance, Mietus forfeited the Apprendi argument, and thus our review is only for plain error.

This means we must determine (1) whether there was error at all, (2) whether it was plain, (3) whether it affected the defendant's substantial rights, and (4) whether it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. Johnson v. United States, 520 U.S. 461, 466-67 (1997). Even if we accept that there was error in this case, that the error was plain, and that it affected Mietus's substantial rights by increasing his sentence by over 7 years, Mietus's claim for relief fails because he cannot show that the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. When the government arrested Mietus, it seized nearly 1,000 kilograms of marijuana from his truck. None

of the defendants in the case ever contested the amount of marijuana found in the truck; rather, their only defense was that they did not know the boxes contained marijuana. In order to convict at all, the jury must have found that Mietus knew that the boxes contained marijuana. There was no evidence to suggest that Mietus could have been guilty of possessing some but not all of the seized drugs. Therefore, the district court's failure to charge the jury as to drug quantity did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings, because had the jury been properly charged, it certainly would have found that Mietus possessed more than 50 kilograms of marijuana. For the same reasons, even if Mietus had properly preserved this argument, we would find that any error here was harmless.

IV

For the foregoing reasons, we Affirm the judgment and sentence of the district court.