# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 02-2304

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RONALD SNOOK,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 699-2—**Ruben Castillo**, *Judge.*

_____

ARGUED JANUARY 7, 2003—DECIDED APRIL 23, 2004

_____

Before COFFEY, ROVNER, and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury found Ronald Snook guilty of one count of conspiring to defraud the federal government by violating the Clean Water Act, 18 U.S.C. § 371, 33 U.S.C. §§ 1317(d) and 1319(c)(2)(A), and five counts of concealing material information regarding a matter within the jurisdiction of the federal government, 18 U.S.C. § 1001(a)(1). He was sentenced to concurrent terms of 21 months' imprisonment, concurrent terms of two years of supervised release, a $1,000 fine, and $600 in special assessments. On appeal he challenges two evidentiary rulings, allegedly improper statements by the prosecution during closing

arguments, and a two-level increase in his offense level for abusing a position of trust, U.S.S.G. § 3B1.3. We affirm in all respects.

Between 1994 and 1997 Snook was the "Environmental Manager" at Clark Refining & Marketing, Inc., a petroleum refinery in Blue Island, Illinois. Prior to being Environmental Manager, Snook had worked at Clark since 1989 as an "Environmental Specialist." Prior to that he was a partner of an environmental consulting firm. As Environmental Manager at Clark, two of his duties included ensuring the refinery's compliance with environmental regulations and overseeing its wastewater treatment system. Each day, Clark discharged on average over a million gallons of processed wastewater into a sewer system that flowed into a water treatment plant of the Metropolitan Water Reclamation District of Greater Chicago (District). Relevant to this appeal are the District's (EPA-approved) regulations of Clark's wastewater discharges.

The District's Sewage and Waste Control Ordinance prohibits Clark from discharging water with (1) a concentration of pollutants such as fats, oils, and greases of greater than 100 milligrams per liter or (2) a pH level lower than 5 or greater than 10. The ordinance requires dischargers such as Clark to self-monitor their compliance and submit reports (RD-115 reports) documenting compliance semiannually to the District. In addition, the District conducts its own periodic testing of dischargers; if it finds that wastewater violates required limits, it will issue an order to cease and desist. In such cases, dischargers such as Clark are required to submit reports (RD-114 reports) documenting that their wastewater is back in compliance. Further, and most relevant here, for both types of reports dischargers must submit *all* of their self-monitoring data even if it was taken in addition to the minimum requirements, and dischargers must notify the District within 24 hours whenever they become aware of any violations.

In July 2000, Snook was indicted for conspiring along with Elva Carusiello, an Assistant Manager at Clark, and Environmental Monitoring and Technologies, Inc. (EMT), a company Clark hired to test its wastewater, to selectively report testing results to the District and for failing to report violations. The indictment alleged that between 1994 and 1997 Clark had EMT test its wastewater on numerous occasions and many of the tests revealed violations; yet Snook submitted a number of RD-114 and RD-115 reports on behalf of Clark that indicated results for only six days (the minimum required) on which Clark's wastewater satisfied applicable standards, and he omitted any results that showed violations. In addition, the indictment alleged that Snook falsely told an inspector for the EPA that the selectively reported data was the only data Clark had collected. In January 2002, a jury found Snook guilty of conspiracy and concealing material information regarding a matter within the jurisdiction of the EPA.

## I.

On appeal, Snook's primary argument is that the district court erred in excluding evidence purporting to show that Clark had selectively reported results prior to Snook becoming Environmental Manager and that EMT selectively reported results for other clients in the past. Snook contends that this evidence was relevant to his state of mind, showing that he believed selective reporting was the established practice at Clark and that it was legal. The district court concluded that absent any evidence that Snook was even aware of these practices, any minimal probative value the evidence might have was outweighed by its potential to be misleading, prejudicial, or confusing. FED. R. EVID. 403. We review the district court's decision for abuse of discretion and will affirm it so long as it was reasonable. *United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003).

First, a preliminary matter. Although Snook argues that the evidence was relevant to all six counts, his beliefs about whether selective reporting was legal were irrelevant to count one. To convict Snook for conspiring to violate the Clean Water Act, which, in relevant part, imposes criminal penalties for "[k]nowing violations," 33 U.S.C. § 1319(c)(2)(A), the government needed to prove only that Snook had knowledge of the underlying facts and not that he knew the conduct was illegal. *United States v. Wilson*, 133 F.3d 251, 262 (4th Cir. 1997); *United States v. Sinskey*, 119 F.3d 712, 715-17 (8th Cir. 1997); *see also United States v. Ho*, 311 F.3d 589, 605-06 (5th Cir. 2002) (Clean Air Act), *cert. denied*, 123 S. Ct. 2274 (2003).

As to the remaining counts, Snook's beliefs about whether he had to report all data and violations were relevant, but we agree with the district court that this proffered evidence was too remote—absent some evidence Snook knew about it. And even if Snook did know about the alleged past practices of Clark or EMT, the evidence still might have been properly excluded absent further evidence that he was told, trained, or otherwise led to believe that selective reporting was the proper procedure. (Perhaps he was aware of the practices and told they were illegal or was told or trained to do otherwise.) Thus the district court's apt description that "[u]nless there's some link-up to this defendant, all we're dealing with is what I believe are various inferences upon inferences of speculation." Therefore, given Snook's lack of evidence that he was aware of theses practices or that he was ever told they were legal, the district court did not abuse its discretion in excluding this evidence.

## II.

Snook next argues that the district court erred in allowing the government to present "other acts" evidence. FED. R.

EVID. 404(b). A former EMT technician testified that in either 1992 or 1993 he returned samples of what he believed to be hazardous materials to Clark, and Snook told him to dispose of the materials at or near a canal dock. Snook argued that this was improper evidence offered to show his propensity to violate environmental laws; the government argued that it showed motive, intent, and plan, *see* FED. R. EVID. 404(b), i.e., Snook's motive, intent, or plan to save money for Clark by not complying with proper procedures. The district court admitted the testimony but instructed the jury to regard it only as to Snook's intent, motive, knowledge, or plan.

The technician's testimony was rather ambiguous, and therefore of limited probative value: for example, he could not be sure whether the samples actually contained hazardous materials, whether he actually showed the samples to Snook, or whether Snook was referring him to a proper disposal area located near the dock. But we need not decide whether this testimony was erroneously admitted, because even if it was, it was harmless due to the district court's limiting instruction and, more importantly, the overwhelming evidence of Snook's guilt. *See, e.g., United States v. Rollins*, 301 F.3d 511, 520 (7th Cir. 2002). First, the government offered a number of documents including both (1) reports prepared and signed by Snook that revealed only favorable data, and (2) more complete reports prepared for Clark from the same period showing numerous violations that were not turned over to the District. (And Snook never challenged the fact that he engaged in selective reporting.) Second, an EMT employee, Nick Preys, testified that Snook (1) contacted him to perform testing for Clark; (2) instructed him to provide two types of reports: one with all testing data, and one with only data showing passing results for six separate days during the testing period; and (3) later instructed Preys to prepare RD-115 reports for Clark using only passing data. Third, Snook's assistant, Carusiello,

testified that Snook showed her portions of the District's reporting ordinance and acknowledged to her that violations needed to be reported within 24 hours. Fourth, the government submitted correspondence from Snook to the District in which he acknowledged that all data must be submitted and violations reported. Fifth, an EPA investigator testified that Snook repeatedly told him that the selectively reported data was all that Clark had collected. Sixth, two environmental experts testified that the reporting requirements were common knowledge among those in the environmental field. Finally, the government established that Snook had worked for a number of years in the environmental field. Given this evidence, we fail to see how Snook was prejudiced by the technician's testimony.

## III.

Snook also argues that on three occasions during closing argument the government improperly commented on his decision not to testify at trial. First, after summarizing the government's case, the prosecutor asked, "[a]nd what is the defendant's response?" Second, after referring to statements made in Snook's opening statement, the prosecutor stated, "I've heard nothing, nothing that backs up those representations." Third, in discussing the conspiracy count, the prosecutor stated that "[a]ll you have to find is that [Snook] agreed not to report violations, and the evidence is basically uncontroverted in that instance."

The Fifth Amendment prohibits prosecutors from inviting jurors to draw adverse inferences from a defendant's decision not to testify by commenting, either directly or indirectly, on that decision. *United States v. Mietus*, 237 F.3d 866, 871 (7th Cir. 2001); *United States v. Robbins*, 197 F.3d 829, 835 (7th Cir. 1999). Indirect comments are improper if either the prosecutor manifestly intended to refer to the defendant's silence or a jury would naturally

and necessarily take the comments to be a remark on that silence. *Mietus*, 237 F.3d at 871. Comments that government evidence is unrebutted are improper only if the defendant was the only person who could have rebutted the evidence. *Id.* If the prosecutor's statements are improper, we determine whether the defendant was prejudiced, or whether the statements rendered the trial so unfair as to deny the defendant due process. *Robbins*, 197 F.3d at 836.

The context of the first two statements reveals that the prosecutor was commenting on Snook's case rather than on his decision not to testify. The first statement ("And what is the defendant's response?") came as a transition after a summary of the government's case and just before a summary of the case put on by Snook. The second statement ("I've heard nothing, nothing that backs up those representations.") was a response to statements made by Snook's counsel that the evidence would show that selective reporting was the established procedure at Clark and the one taught to Snook (this referred to the excluded evidence discussed above in part I). And following both statements, the district court reminded the jury that the government and not Snook had the burden of proof. *See United States v. Wilson*, 237 F.3d 827, 835 (7th Cir. 2001) (juries assumed to follow instructions). Because these statements were comments on the weakness of Snook's case rather than his silence, they were not improper. *See United States v. Xiong*, 262 F.3d 672, 675 (7th Cir. 2001) (prosecutor may comment on weakness of defendant's case).

The third statement is a closer call. The prosecutor's comment that Snook's decision to selectively report was "basically uncontroverted" would be inappropriate if Snook were the only person who could refute the point. But this was not the case. Snook's counsel could have, for example, tried to show that the documents Snook submitted did report all the available data or that others submitted the data without his knowledge. Moreover, Snook never chal-

lenged whether he selectively reported; his theory was that he believed it to be legal. So the prosecutor was more likely referring to this fact rather than Snook's silence. Consistent with this is the prosecutor's statement immediately before that, on the conspiracy count, the government need not prove Snook knew the practice was illegal. But even if this, or the other two statements, crossed the line and were improper, Snook was not prejudiced because of the over-whelming evidence of his guilt, as discussed above. *See Mietus*, 237 F.3d at 873; *Xiong*, 262 F.3d at 676.

IV.

Finally, Snook challenges the district court's decision to impose a two-level increase in offense level for abusing a position of trust. U.S.S.G. § 3B1.3. The increase is appropri-ate when a defendant occupies a position of trust and abuses that trust to significantly facilitate a crime. *United States v. Cruz*, 317 F.3d 763, 766 (7th Cir. 2003); *United States v. Mabrook*, 301 F.3d 503, 510 (7th Cir. 2002). No formal labels or categories dictate when a defendant occupies such a position; instead we look to the relationship between the defendant and the victim and the level of responsibility the defendant was given. *Mabrook*, 301 F.3d at 510. We review the district court's interpretation of the Guidelines *de novo*, and we review the district court's finding that the defendant occupied and abused a position of trust for clear error. *Cruz*, 317 F.3d at 765-66; *Mabrook*, 301 F.3d at 510.

The district court imposed the increase after finding that Snook occupied and abused a position of trust with respect to his victims, the District and the public, based on the responsibilities given to Snook in his job and under the statute, and his potential to affect health and safety. Snook contends that he occupied a position of trust with respect to

Clark but not to the District or the public. We disagree. The Clean Water Act is public-welfare legislation and the victims of violations are the public. *United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1049 (9th Cir. 2002). As Environmental Manager at Clark, Snook was given discretion to devise Clark's wastewater treatment and testing systems, as well as to decide when to conduct such testing. And although the District did periodically conduct its own testing, it was for the most part dependent on the data that Clark reported. The facts here illustrate this point effectively—for over three years Clark's wastewater had numerous violations that went undetected because Snook, in his unique position as Environmental Manager, did not report them. Moreover, unlike other self-reporting situations (taxpayers, for example), the regulations here apply to matters that directly and significantly affect the public's health and safety. *See United States v. Gonzalez-Alvarez*, 277 F.3d 73, 81-82 (1st Cir. 2002) (abuse-of-trust increase applied to dairy farmer for not complying with regulations); *United States v. White*, 270 F.3d 356, 372-73 (6th Cir. 2001) (employee at water-treatment plant); *United States v. Turner*, 102 F.3d 1350, 1360 (4th Cir. 1996) (owners and operators of coal mine); *but see Technic*, 314 F.3d at 1049-52 (not applied to private contractor hired to clean up asbestos). Given the responsibility and discretion given to Snook in his position as Environmental Manager in complying with the District's regulations, and his abuse of that position, the district court did not err in applying the sentencing increase.

AFFIRMED.

COFFEY, *Circuit Judge*, dissenting.  I agree with the majority's presentation of the facts at issue, and I concur with the majority's decision to affirm Snook's conviction. However, I cannot join the majority's decision to affirm Snook's sentence, because, notwithstanding the majority's assertion to the contrary, I do not agree that Snook occupied a "position of trust" (as that term is used in the Guidelines) vis-à-vis the public. Thus, it would be entirely improper to apply the U.S.S.G. § 3B1.3 "abuse of public trust" enhancement against Snook in this case.

The district court enhanced Snook's sentence pursuant to U.S.S.G. § 3B1.3, which provides for a two-level enhancement where a defendant abuses a "position of trust" that he occupies in relation to the victim of his crime. Section 3B1.3 provides, in relevant part:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.

As delineated in the commentary to the Guidelines, the phrase "position of trust" "refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 comment. (n.1). In explaining the proper application of a "position of trust" enhancement, the commentary goes on to set forth a number of examples of "abuse of trust," including, "embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." *Id.*

In the case before us, the trial judge found that Snook, as the Environmental Manager at a *private* petroleum refinery

(Clark), held a "position of trust" vis-à-vis the public.[1] Moreover, the court concluded that by violating the Clean Water Act ("CWA")—a "health and regulatory statute"—Snook engaged in criminal activity that had a "potential direct physical effect on the general public . . . such that . . . the adjustment . . . for violating a . . . position of trust [wa]s appropriate." Sent. Tr. at 19-20. This Court "review[s] the district court's application of the enhancement *de novo* and review[s] the finding that [Snook] occupied such a position under the clearly erroneous standard." *United States v. Mabrook*, 301 F.3d 503, 510 (7th Cir. 2002).

As set forth under Section 3B1.3, the "abuse of trust" enhancement applies *only* where a defendant possessed the requisite level of discretion, and, further, where that discretion was "entrusted *to the defendant by the victim*."

---

[1] At sentencing, the court used the phrases "position of private trust" and "position of public trust" interchangeably, and in fact, at one point, purported to "overrule the defendant's objection to the use of . . . [the Section] 3B1.3 [enhancement for violation of] position of *private* trust." Sent. Tr. at 20. Elsewhere in its oral ruling, however, the court made clear that its application of the Section 3B1.3 enhancement was based upon Snook's violation of a position of *public* trust, noting that the CWA was "a statute that [wa]s uniquely a health and regulatory statute, [and that Snook's violation thereof presented] a potential direct physical effect *on the public and the public that is trying to be served by the MWRD*." *Id.* at 19-20. Where, as here, the victim of the defendant's criminal activity was the general public, the Section 3B1.3 enhancement applies, if at all, if the defendant occupies a position of trust vis-à-vis *the public. See United States v. White*, 270 F.3d 356, 371 (6th Cir. 2001) ("The abuse-of-trust enhancement may only be applied where the defendant abused a position of trust with the victim of his charged conduct.") Thus, as the majority has done, I will assume the district court applied the enhancement on the basis of Snook's alleged violation of a position of *public* trust.

*United States v. Broderson*, 67 F.3d 452, 456 (2d Cir. 1995) (emphasis added). That is, the "position of trust" determination is assessed "from the perspective of the victim." *United States v. Hathcoat*, 30 F.3d 913, 919 (7th Cir. 1994). Moreover, recognizing the fiduciary nature of the "trust" relationships set forth as examples in the commentary—*i.e.*, attorney/client, bank executive/bank client, and doctor/patient relationships—courts have emphasized that, to qualify as a "position of trust," "[t]he guideline enhancement requires more than a mere showing that the victim had *confidence* in the defendant. Something *more akin to a fiduciary function is required.*" *United States v. Brunson*, 54 F.3d 673, 678 (10th Cir. 1995) (emphasis added); *see, e.g.*, *Mabrook*, 301 F.3d at 510 (noting that a defendant's fiduciary duty vis-à-vis the investors in his company placed him in a position of private trust). Thus the victim must have placed the defendant in a position where he or she is performing a "fiduciary function," or exercising discretion over the victim's affairs. *See Varity Corp. v. Howe*, 516 U.S. 489, 504 (1996). Indeed, it is worth noting that "*every example* of an abuse of trust in the Commentary . . . involves a victim entrusting <u>an agent or employee</u> with discretion." *Broderson*, 67 F.3d at 456.

Applying these principles to the instant case, it is clear that Snook *did not* occupy a "position of trust" vis-à-vis the public, for the simple reason that he did not serve in a fiduciary (or even quasi-fiduciary) capacity with respect to his victim, the public. One cannot be a fiduciary without first being placed in that position by the claimed beneficiary of the relationship. *Lopacich v. Falk*, 5 F.3d 210, 213 (7th Cir. 1993) ("In order to establish evidence of a fiduciary relationship, the plaintiff must show [first] that she reposed confidence in the defendant . . . ."). The public did not place Snook in the position of Environmental Manager, and thus "entrust" him to comply with the Clean Water Act's reporting requirements. Snook was not a government employee,

and thus could not be considered or classified as a public servant by nature of his employment. Nor was he even a private employee subject to professional licensing requirements, and therefore entrusted to abide by certain standards in order to maintain the public's trust in his profession (such as a physician or an attorney). Rather, Snook was a private employee, selected by *Clark*, and not the public, to monitor the corporation's compliance with the Clean Water Act. And it was Clark, and *not the public*, who reposed its confidence in Snook such that a fiduciary relationship may have been created. To be sure, the public may have "trusted" Snook to obey applicable environmental regulations, as it "trusts" *any* citizen to abide by *any* law protecting matters in the public interest (such as drunk driving laws, speeding laws, reckless driving laws, anti-theft laws, and environmental protection laws, etc.). But the public did not *entrust* Snook (in the sense of placing a fiduciary obligation on Snook) with the duty of protecting its health and welfare interests in the environment; when Clark selected Snook to serve as its Environmental Manager, he did not take an oath of office or swear to abide by the provisions of the Clean Water Act and protect the public from pollutants in its water system. Thus Snook was *certainly* not acting in the capacity of an agent or employee of the general public. *See Broderson*, 67 F.3d at 456.

The fact that the District's regulatory regime involved an element of self-reporting duty on the part of Clark (and Snook, as Clark's agent) does not change this result. Although Snook may have been responsible for certifying Clark's water quality reports to the District in accordance with the CWA, "whatever 'trust' [the public or the district] placed in [Snook] was based [entirely] on the explicit commands of [the CWA and related regulations]." *Id.* Thus, Snook had bare legal and statutory obligations to the public in general, as does any private citizen who files a tax return or drives a vehicle on public roadways, but nothing more.

If any party in this scenario was a fiduciary of the public's environmental welfare and health safety, it was the *District Office or district officer* (not Clark or Snook), insofar as the District was ultimately responsible for ensuring Clark's compliance with applicable regulations. The District (or the district officer in command) performed numerous unan-nounced inspections of Clark's water discharge to ensure its compliance—anywhere from two to seven tests per year during the years 1993 through 1996. *See* Tr. at 209-210, 217-18. And, whenever Clark was found not to be in compliance, the District issued cease and desist orders to Clark to enforce compliance. *Id.* at 230. Indeed, the fact that the District monitored Clark's discharge levels annually—some two to seven times per year—to assure compliance belies the Government's claim that it was Clark, and not the District, who was *trusted* to comply with the CWA and attendant regulations.

The majority disagrees, arguing that because the District does not have the resources to fully monitor or ensure Clark's compliance with the CWA, Clark (and Snook, as its officer) occupied a "position of trust" vis-à-vis the public. *See* Opinion at 9 ("Snook was given discretion to . . . decide when to conduct [water] testing [and] although the District did periodically conduct its own testing, it was for the most part dependent on the data that Clark reported."). But this is true of many regulatory frameworks—the IRS, for example, certainly does not have enough resources to audit every defaulting and defrauding taxpayer annually. Thus, if we extend the majority's reasoning to the IRS arena, then every corporate executive who certifies a corporation's tax return to the IRS occupies a "position of public trust," and thus may be subject to a Section 3B1.3 enhancement for filing a false tax return even though he has every reason to believe his client gave him accurate information. *See Broderson*, 67 F.3d at 455 ("[t]he government's theory seems so [expansive and] far reaching that it might cause virtually

anyone who is commanded by statute to make an accurate report to the government to be subject to a Section 3B1.3 enhancement . . . . [including] taxpayers who file false tax returns . . . . We believe that it is fairly obvious that the Sentencing Commission harbored no [such] intent that the enhancement be so sweeping.").

Certainly, this would be an absurd result, for a corporate officer who is a private employee of a private corporation, is not a "fiduciary" or agent of the public (even though his fraudulent reporting may do significant harm to the public by imposing a heavier burden on other taxpayers). Equally absurd is the notion that a research scientist who discovers a wonder drug that is approved by the Food and Drug Administration ("FDA"), but is later discovered to have dangerous side effects, could be subject to a Section 3B1.3 "position of public trust" enhancement. Under the majority's expansive reading, such a scientist who may have negligently performed his research, would have abused a "position of public trust" in reporting his findings to the FDA, even though the FDA is the entity ultimately responsible for ensuring that the public is safe from dangerous pharmaceuticals.

Seeking to avoid this extension of their logic, the majority would limit application of the public trust enhancement to *criminal* activities that implicate issues of "public health." However, it is unclear on what basis the majority makes this distinction, for no "health and welfare" distinction is to be found anywhere in the text of the Sentencing Guidelines themselves.[2] Indeed, *nothing* in the Sentencing Guidelines

---

[2] Curiously, the majority cites *United States v. White*, 270 F.3d 356, 372-73 (6th Cir. 2001) in support of the distinction between reporting crimes concerning "public health" (where the enhancement is applicable) and all other reporting crimes (such as filing

(continued...)

suggests that the public trust enhancement should apply in a different manner when issues of health and safety are concerned—and yet that is the exact distinction the majority reads into the Guidelines in the instant opinion. *See* Opinion at 9-10 (noting that the "public trust enhancement" would not apply to ordinary private citizens who failed to abide by self-reporting requirements (such as taxpayers), but that it does apply to citizens such as Snook because Snook violated "regulations [that] apply to matters that directly and significantly affect the public's health and safety.").

Moreover, save for the First Circuit's opinion in *United States v. Gonzalez-Alvarez*, 277 F.3d 73, 81-82 (1st Cir. 2002), no other circuit court (including the Seventh Circuit) has extended the public trust enhancement to private individuals who work in industries that are regulated to protect the public health but this is exactly what the

---

(...continued)

a false IRS return). Although the *White* Court did find an abuse of public trust where the defendant had committed an environmental wrong, *White* is distinguishable from the instant case, in that it involved the environmental wrongdoings of an officer of a local Water District—a governmental entity, and not a private corporation—who was on the public's payroll and clearly had a duty to the public. That is, the Sixth Circuit concluded that the defendant occupied a position of public trust because he, a public servant, was "charg[ed] [with the control of the Water District's] water purification efforts with apparently little or no oversight." *Id.* at 372. Thus, the Court "imputed" the "quasi-fiduciary trust relationship between the District and its customers" to White. *Id.* at 373.

In this case, by contrast, Clark did *not* serve the general public, insofar as it was a private oil refinery and *not* a governmental water provider. Thus, there exists no quasi-fiduciary relationship between Clark and the public that may be imputed to Clark's employees (including Snook).

majority has chosen to do by announcing the "public health" distinction it sets forth today. In fact, the Ninth Circuit expressly *rejected* such a distinction in *United States v. Technic Services, Inc.*, 314 F.3d 1031 (9th Cir. 2002), noting that, while the importance of health and safety laws may "heighten the amount of interest the public has in [citizens abiding by such laws]," such fact alone "*do[es] not [establish] the relational kind of interest that is required to find a position of public trust*" under the Guidelines. *Technic Services*, 314 F.3d at 1050 (emphasis added).

Indeed, the position of trust inquiry focuses *not* on the nature of the statute violated by the defendant, but rather on whether or not a "'fiduciary or personal trust relationship exist[ed]' with [the victim], and [whether] the defendant t[ook] advantage of the relationship to perpetrate or conceal the offense.'" *United States v. Caplinger*, 339 F.3d 226, 237 (4th Cir. 2003) (quoting *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996)). Thus, for a defendant to have occupied a position of trust with the public, he must have worked as an agent or employee of the government, or held some other fiduciary-type position vis-à-vis the government or the public, and this was not the case in the factual situation before us.[3] *See, e.g., United*

---

[3] Notably, the First Circuit, in *Gonzalez-Alvarez*, 277 F.3d 73 (1st Cir. 2002), is the only court that has ever found that the "abuse of public trust" enhancement applies to a wholly private employee whose profession was not regulated by professional licensing requirements. Until *Gonzalez-Alvarez*, the broadest application of the enhancement was to beneficiaries of government contracts, *see, e.g., United States v. Velez*, 185 F.3d 1048 (9th Cir. 1999) (private immigration consultant who was given favored status under a statutory grant when submitting applications to the Immigration and Naturalization Service), physicians, *see, e.g.,*

(continued...)

*States v. Kuhn*, 345 F.3d 431, 437 (6th Cir. 2003) (holding that the Superintendent of a city's water treatment plant held a position of public trust because he was a "government employee, charged with the safe and efficient operation of a wastewater treatment operation"); *Technic Services*, 314 F.3d at 1050 (concluding that the secretary of a government contractor in charge of asbestos clean-up *did not* hold a position of public trust, because he had "no trust relationship with the government by virtue of government employment; nor was he a public officer with a 'special' or quasi-fiduciary relationship to particular members of the public because of duties to protect their health; nor did he hold a position in which the public directly delegates duties and places the public welfare in the incumbent's hands"); *United States v. White*, 270 F.3d 356, 372-73 (6th Cir. 2001) (holding that an employee of the local Water District held a position of trust vis-à-vis the public, because customers of the Water District "granted the District substantial discretion . . . as to how to provide [their drinking water]" and that such "quasi-fiduciary trust relationship . . . [was] imput[able]" to the District employee); *Broderson*, 67 F.3d at 452 (holding that employee of government contractor did *not* occupy position of trust vis-à-vis the government, for in his negotiations with the government, he was bound not by fiduciary obligations, but by the Truth in Negotiations Act and the Federal Acquisition Regulations). *But see Gonzalez-Alvarez*, 277 F.3d at 81 (concluding that a dairy farmer held a position of public trust, insofar as the public "was entitled to have diary farmers such as [defendant] provide milk . . . compliant with all FDA and ORIL regulations"). And, pertinent to the instant case, "statutory

---

(...continued)
*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997), and attorneys, *see, e.g.*, *United States v. Hemmingson*, 157 F.3d 347 (5th Cir. 1998).

reporting requirements *do not* create a position of trust [or fiduciary obligation] relative to a victim of the crime." *United States v. Garrison*, 133 F.3d 831, 840 (11th Cir. 1998).

No matter how egregious a defendant's conduct, Section 3B1.3's abuse of trust enhancement may not be applied against him unless he occupied a position of trust vis-à-vis the victim, and abused that position of trust to facilitate his crime. In the factual situation presented to us, the fact that Snook was *not* employed by the government (but, rather, a private oil refinery), together with the fact that Snook's environmental reports submitted to the District were "monitored" by the District through random sampling (some two to seven times per year) reveals that Snook did *not* have a fiduciary or personal trust relationship with the victim, the public (or the victim's fiduciary, the District). Thus, the Section 3B1.3 public trust enhancement does not apply. For this reason, the sentencing court's application of the public trust enhancement to Snook was clearly erroneous; I would reverse the imposed sentence and remand for resentencing.

A true Copy:

      Teste:

                  _____

                  *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*