In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3884

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARCUS L. HARRIS,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 99 CR 30083--Richard Mills, Judge.

Argued APRIL 4, 2001--Decided November 6, 2001

Before COFFEY, MANION, and DIANE P. WOOD,
Circuit Judges.

COFFEY, Circuit Judge.  The defendant
Marcus Harris appeals his conviction for
selling powdered cocaine in the city of
Springfield, Ill., on November 11, 1998,
in violation of 21 U.S.C. sec. 841(a)(1).
A jury found Harris guilty as charged and
he was sentenced to 360 months
imprisonment, six years supervised
release, and a $100 special assessment.
On direct appeal of his conviction,
Harris argues that the prosecutor's
closing argument included improper
commentary on his failure to testify, his
courtroom behavior, and misstatements of
the burden of proof, and he also claims
that the trial judge should not have
admitted evidence of uncharged drug
transactions. We affirm.

I.  BACKGROUND

In early 1998, federal agents and local
police in Springfield, Ill., received
information from several confidential in
formants that defendant Marcus Harris was
involved in the sale of cocaine, and
resulting in Harris becoming the subject
of a drug investigation. On November 6,
1998, Springfield police officers, while
executing a search warrant, discovered
drugs and drug paraphernalia at the home
of a woman named Jill Nelson. Levannon
Berry Young, who had a lengthy criminal

record, was present in Nelson's home at the time of the raid. Young had known Harris for some 15 years and had purchased cocaine from Harris on numerous occasions. Young agreed to assist the officers in their investigation of Harris and agreed to make a controlled purchase of cocaine while wired with a recording device and to testify truthfully for the prosecution at Harris' subsequent trial./1

A. Harris' Past Drug Dealing and the Use of Code Language

During Harris' trial, Young testified that Harris mandated a strict set of rules for those participating in his drug transactions. Harris insisted that all conversations, including telephone calls, be conducted in a casual manner and that drugs never be mentioned during any transaction. Harris also insisted that Young use personal code language when discussing drugs. The code language was of such importance to Harris that if any one of his customers slipped up and mentioned drugs or failed to use the code system, Harris would terminate the conversation. Young also testified about Harris' usual modus operandi for the transfer of money and delivery of drugs. Harris insisted on payment in advance of any drug sale, and he would not designate a meeting place for the transfer of drugs until after payment had been made.

B. Young's Purchase of Drugs from Harris

On November 10, 1998 (four days after the drug raid at Jill Nelson's residence), Young reported to the FBI that he had arranged a drug deal with Harris and he was wired for voice recordings at that time. On November 11, 1998, Young received a telephone call from Harris suggesting a meeting at a convenience store. Young proceeded to the designated location, but Harris did not appear.

While Young was on his way home, he received another phone call from Harris, and only Young's side of the conversation was recorded. According to Young's testimony explaining the recording of this conversation, Harris stated that his failure to appear at the meeting was because he feared that a government informant might be at the convenience

store,/2 but in spite of this fear they agreed to meet at the same location.

After Young returned to the store and joined Harris, the two men got into Young's car and again engaged in a recorded conversation in which Harris stated, "I workin' with a deuce, man, what you want to do?" to which Young replied, "I want 'em . . . where we at? On Eighteenth?" Harris' response was, "I'll do that for you . . . . There just ain't no better than the Pres'dents." Young testified at trial that Harris' reference to "a deuce" was code for two ounces of cocaine and that, "Where we at? On Eighteenth?" was Young's drug lingo question asking Harris whether he would sell the two ounces for $1,800. Young further explained that Harris' response, "I'll do that for you," meant that Harris agreed to the price, and that Harris' remark about "the Pres'dents" was a reference to currency, or bills bearing the presidents' portraits. Testimony at trial from Young and an FBI agent established that there was no street designated as "Eighteenth Street" in Springfield, Ill., as of the date of the offense (November 11, 1998). In the dissenting opinion, the author takes umbrage with this testimony and suggests that there was an Eighteenth Street at the time of the offense./3 In fact, Eighteenth Street was redesignated (named) in 1984, Dr. Martin Luther King, Jr. Drive; a copy of the City of Springfield ordinance, which is still in effect, follows:

After the majority made clear with the insertion of a copy of the Springfield City Ordinance designating Eighteenth Street as Dr. Martin Luther King Jr. Drive in 1984, the dissent replied with another assertion in this opinion: this time, "that in common parlance the old name has not died away" and that the evidence on this point "was not so overwhelming as the majority paints it to be." In an attempt to undermine the jury's verdict, the dissent has failed to support its position with even a scintilla of evidence in the record. Rather, the dissent has resorted to the unprecedented tactic of citing extrinsic materials gleaned from conflicting Internet websites, newspaper articles,

and the negligent remarks of assistant United States attorneys sprinkled in the wholly separate pleadings of a wholly separate case than the one at hand. Cf. GE Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1084 (7th Cir. 1997) (citing Cofield v. Alabama Pub. Serv. Comm'n, 936 F.2d 512, 517 (11th Cir. 1991), for the proposition that daily newspapers are not reliable evidentiary sources); Zell v. Bender, Inc., 542 F.2d 34, 38 (7th Cir. 1976) (declining to consider documents filed in a companion case involving the same parties and being heard by the same district judge). Of course, these materials were not submitted to the jury, and we fail to see how the dissent can logically attack the sufficiency of the evidence presented at trial by pointing to information that the jury never saw or heard./4 See Taylor v. Kentucky, 436 U.S. 478, 485 (1978).

In short, there is no question that Young and Harris extensively discussed their drug transaction while they were riding in the car together./5 After arriving at Young's house, Young went inside and obtained $1,800 from Springfield Police Detective James Graham while Harris remained in the car. Detective Graham observed Young leave the house and enter his car, observed him turning the money ($1,800) over to Harris, and saw Harris put the money in his pocket. The two men departed in Young's car and during their recorded conversation Young was heard asking Harris to sell the cocaine for $1,200 ("what about twelve again"), and Harris replied in the negative (in code) that "the story is for you to meet me on Eighteenth," (meaning that the price was still $1,800).

At trial, Young testified that during the ride he saw Harris count the money and told Young that he (Young) was short a hundred dollars from a previous drug deal. Referring to the unpaid $100 Harris stated, "I see you want me to take my teaspoon out, a tablespoon," to which Young replied, "Man, don't take nothing out of it man. It ain't nothin' but a . . . dollar, . . . and I'll have it when you see me." Young testified that Harris' reference to taking out a "teaspoon" or "tablespoon" was a warning that he (Harris) intended to remove a small

portion of the cocaine unless Young repaid the $100 debt (referred to in the conversation as "a dollar").

Young returned to his home where he was searched by Detective Graham for money and/or drugs and he was clean. Approximately five minutes later, Young received another phone call from Harris, requesting that he meet him at a local barber shop. After Young arrived at the barber shop parking area, the agents observing the area decided that continuing visual surveillance would be precarious because they believed that they might be spotted. Young's conversation with Harris in the barber shop parking lot was again recorded.

This tape was also played during the trial and revealed that after some social conversation, Harris instructed Young to "look in the glove box" of his truck. Young followed directions and discovered two ounces of cocaine. The next comment heard was that of Young speaking to Harris and stating, "You spooked, man." Young testified that he made this remark to the defendant because Harris began acting very suspicious and afraid at the very time that Young opened the glove box. Furthermore, when explaining the "You spooked, man" comment to the court, he went on to state that Harris at this time was looking all around and seemed to be nervously looking at all people in the immediate area and observing "every little detail" about the cars passing by.

On the tape recording, Harris is heard telling Young, "Yeah, peep it, man. . . . It's tight, it's on the knob." Young interpreted this to mean that he should examine the cocaine ("peep it"--look at it) and that the bags contained exactly two ounces of cocaine as agreed upon ("it's on the knob"). At this point, a loud sound was heard on the tape. Young stated that this noise came about as a result of the two one-ounce bags of cocaine coming in contact with the recorder as he dropped the bags of drugs into his pocket. After the sale and delivery from Harris, Young testified that he immediately returned to his residence and turned the cocaine and recordings over to the officers. A subsequent analysis confirmed that the substance was cocaine, weighing 54.8 grams, thus corroborating Young's

testimony that the two men made a deal for a "deuce," or two ounces, of cocaine.

C.  Closing Arguments

   After the prosecution completed its presentation, Harris decided not to testify nor present any evidence. The prosecutor began his closing argument stating what he believed to be undisputed facts. According to the government, the undisputed facts were: 1) the defendant met with Young three times within a 12-hour period on the day of the offense; 2) during the second meeting Detective Graham witnessed Young hand the defendant $1,800; and 3) that after his meeting with the defendant a third time, Young returned with two ounces of cocaine. The government spent the remaining time discussing the content of the tape recordings. These tapes, according to the prosecution's theory, were of the utmost importance in establishing Harris' guilt.

   For example, with regard to the recorded conversation concerning "Sam," the prosecution stated:

Now, that's a perfectly plausible explanation for this, or Sam being there, but if this is an innocent meeting where they were just going to shoot some pool, why would the defendant be concerned about Sam being there? The explanation given by Berry Young is absolutely unrebutted in this case.

(Emphasis added).

   With regard to Harris and Young's conversation regarding "Eighteenth Street," the prosecutor stated, "[y]ou have to look at the context of what is going on to understand what's going on. And I would love to hear some reasonable innocent explanation for those references to Eighteenth Street in the context they're in with the responses that the defendant gives." (Emphasis added).

   In concluding his closing argument, the prosecutor referenced a pre-trial chance encounter between Detective Graham, Sergeant Benny O'Neal, and the defendant:

And as the defendant walks up to them, makes a point of walking up to them, shaking hands with Benny O'Neal and says,

"Hey, I hear your buddy Berry wore a wire on him." And Benny O'Neal, "What? Who are you talking about?" "Berry Young. I hear he's been talking to you for a year."

What was his manner? Cocky. Just like it's a joke. What's been the defendant's manner during the trial? Cocky, like it's a joke. You'll never catch me. I'm too careful. But not careful enough.

(Emphasis added).

   During the government's rebuttal argument, the prosecutor commented on Harris' demeanor in the courtroom:

Trust your own ears. The most important witness in this case is not Berry Young. We don't trust him. We report what's said. The most important witness sits right over there in the green jacket [pointing to the defendant]. The guy that's had a smirk on his face during the trial. It's his words on the recordings that convict him. . . . He is the most important witness against himself, because he got caught. Cagey though he may be, have tried to be, he was not nearly as smart as he thought he was.

****

We don't have to prove that the defendant was the only possible place Berry Young could have obtained two ounces of cocaine. What we do have to prove is did Berry Young obtain those two ounces from the defendant, beyond a reasonable doubt . . . .

The issue is did Berry Young obtain these two ounces which he brought back to Agent Graham from the defendant? If we prove that beyond a reasonable doubt, the defendant is guilty. That's the issue.

(Emphasis added).

   The prosecutor then turned his attention to the content of the tape recordings introduced at trial:

It's not Berry Young. Berry Young only provides explanations, and it's up to you to make up your own mind, does that make sense? Is that reasonable in the context of this tape?

It's the tape recording that is the

evidence. Berry Young is only providing explanations of that evidence, and it's up to you to decide whether they make sense, whether they're reasonable.

Now I'll suggest to you that yes, they're not only reasonable, they're the only reasonable explanation. There is no other reasonable explanation of what the--for what the defendant said. And if there is no other reasonableexplanation, then there is no reasonable doubt about what happened.

****

Absent any reasonable alternative explanation for the defendant's comments to Berry Young that the government says related to drugs, . . . if there is no other reasonable explanation for those statements than that given by Berry Young, there is no reasonable doubt about where Berry Young got those two ounces.

There simply is no other reasonable way to explain that defendant's own statement to Berry Young in the context in which it was requested from the events that transpired on both.

(Emphasis added).

During the trial, defense counsel raised not one objection to any of the prosecutor's statements now objected to. However, six days later, for reasons unexplained, Harris and his counsel must have suffered a change of heart and filed a motion for a new trial, arguing that the prosecutor's comments made in his closing argument were improper. The trial judge, in denying the defendant's motion, ruled that the prosecutor's comments were not improper and, even if they were, any error was harmless in view of the overwhelming evidence of guilt in the record.

II. ISSUES

On direct appeal, Harris argues that the portions of the prosecutor's closing argument referred to prejudiced his right to a fair trial by: 1) making indirect references to Harris' failure to testify; 2) making references to Harris' off-stand (courtroom) behavior; and 3) misstating the burden of proof. Harris also argues that the trial judge abused his

discretion when admitting evidence of uncharged drug transactions between himself and Young. We affirm.

## III. ANALYSIS

### A. Right to a Fair Trial

Claims that a prosecutor has tainted a trial with improper remarks are analyzed with a two-step inquiry. United States v. Renteria, 106 F.3d 765, 766 (7th Cir. 1997). Initially, we consider the remarks themselves to determine whether they were, in fact, improper. United States v. Cusimano, 148 F.3d 824, 831 (7th Cir. 1998). If the prosecutor's remarks are found to be improper, we then consider whether they have impacted the fairness of the trial based upon the content of the entire trial record. Id. The defendant's burden concerning the second prong of this test has been well-articulated:

To carry this burden, [the defendant] must show that it is at least likely that the misconduct complained of affected the outcome of the trial--i.e., caused the jury to reach a verdict of guilty when otherwise it might have reached a verdict of not guilty.

United States v. Morgan, 113 F.3d 85, 89 (7th Cir. 1997); see also Renteria, 106 F.3d at 766; Cusimano, 148 F.3d at 831; United States v. Badger, 983 F.2d 1443, 1456 (7th Cir. 1993).

When applying the harmless error doctrine in assessing the impact of an alleged improper comment by a prosecutor, an otherwise valid conviction will not be set aside unless the reviewing court finds, based on the record as a whole, that the error likely affected the outcome of the trial. Rose v. Clark, 478 U.S. 570, 576 (1986). When harmless error analysis is applied, a new trial may be warranted when the error has a "substantial and injurious effect or influence on determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (emphasis added). We have described our application of harmless error analysis in the context of a prosecutor's commentary during closing arguments as follows:

Because the prosecutor's comments in this

case did not directly comment on Ashford's failure to take the stand or present a defense, but rather were addressed to the presence of uncontradicted evidence . . . they violated Ashford's Fifth Amendment rights only to the extent that the 'language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify.'

* * *

Comments about a defendant's failure to testify do not necessarily mandate reversal, however. The issue is whether the error was harmless beyond a reasonable doubt. The question of whether the error was harmless in turn depends on the strength of the evidence against the defendant.

United States v. Ashford, 924 F.2d 1416, 1425 (7th Cir. 1991) (emphasis added, internal quotations and citations omitted).

   In our review of the prosecutor's alleged improper comments we must also take into consideration that Harris failed to raise a contemporaneous and specific objection to the alleged improper remarks. To preserve an issue for appellate review, a party must make a timely and specific objection, in order that he or she might alert the court and the opposing party as to the specific grounds for the objection during trial. United States v. Vega, 860 F.2d 779, 789 (7th Cir. 1988). The failure to interpose a timely and spe-cific objection results in our reviewing the statements under the plain error standard. See Fed. R. Crim. P. 52(b); Renteria, 106 F.3d at 766. In the context of alleged prosecutorial misconduct, this standard mandates an additional burden for the defendant to demonstrate that the prosecutor's comments were "obviously" or "clearly" improper. Renteria, 106 F.3d at 766-67.

   1.  Alleged Impropriety of the Prosecutor's Comments

   We note that the government essentially concedes that the prosecutor's references to Harris' off-stand demeanor were

improper by arguing only that the remarks, even if improper, were harmless error. Thus because of this concession (step one of the inquiry) we will analyze the second prong of the test to determine whether this or any other alleged error was harmless. Even were we to assume that all of the prosecutor's challenged comments were improper, we would still remain convinced that any error was harm less and that Harris received a fair trial based on the overwhelming evidence of guilt and the proper jury instructions.

We first note that the dissent has undertaken an analysis of the prosecutor's comments on certain "uncontested evidence" and stated that they were improper because the statements would necessarily have been interpreted as a comment on the defendant's decision not to testify. We disagree. The law is most clear that any indirect commentary on the defendant's failure to testify, including references to "uncontradicted" or "uncontested" testimony, in order to be improper, must (1) consist of language and words that are "manifestly intended" to be a comment on the defendant's decision not to take the stand, when analyzed in the context in which they are used, or (2) be of such a character that the jury would "naturally and necessarily take it to be a comment on the defendant's silence." United States v. Lyon, 397 F.2d 505, 509 (7th Cir. 1968) (emphasis added), cert. denied, 393 U.S. 846; United States v. Flannigan, 884 F.2d 945, 954 (7th Cir. 1989); Ashford, 924 F.2d at 1425. The dissent concludes that the jury in this case would naturally and necessarily have interpreted the prosecutor's statement that Young's testimony concerning "Sam's" alleged presence at the convenience store was "unrebutted" to be a comment on Harris' decision not to testify, but we disagree. After considering the record in its entirety as we must, we are convinced that the prosecutor's reference to this evidence being "uncontested" does not "necessarily" convey the implied meaning the dissent assigns to it. The prosecutor's comment was made in the context of an assessment of Young'sexplanation of the tape recorded conversation. In the interest of presenting the complete picture, the prosecution introduced both the tapes and

Young's testimonial explanation as to what was being discussed, and the accuracy of Young's explanations was subsequently tested on cross-examination. The contested portion of the prosecutor's closing argument focused only on the accuracy and reasonableness of Young's explanations. Viewed in this context, we are convinced that the prosecutor's statements during argument would more logically and naturally be interpreted as mere commentary on the trustworthiness of Young's explanation of the taped conversation, contrary to the dissent's view that the statement could only refer to Harris' decision not to testify. It needs to be pointed out that the dissent, sitting as a reviewing court, must not "assume that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations," for "the government should not be restricted to a sterile recitation of uncontroverted facts," and counsel certainly can "make arguments reasonably inferred from the evidence presented." United States v. Rose, 12 F.3d 1414, 1424 (7th Cir. 1994) (emphasis added). Furthermore, we wish to make clear that Harris was not the only person who could have rebutted Young's explanation of the taped conversations because had the defendant so desired, he could have presented his own "expert" to challenge Young's testimony and to possibly offer alternative explanations for the code language and other conversation used on the tapes, and for reasons unexplained in this record he chose not to call such an expert, probably because he was convinced it would be of no avail. Harris has failed to demonstrate that permitting the jury to hear the "uncontested evidence" statements was plainly erroneous.

We also disagree with the dissent's conclusion that it was improper for the prosecutor to refer to testimony concerning the transfer of money from Young to Harris as being "not contested." The dissent reaches its view by making the questionable assertion that Harris was the only person who could have rebutted the government's theory. In fact, the dissent seems to forget that the money transfer ($1,800) from Young to Harris was observed by a third-party-eye-

witness, namely Detective Graham, and the fact that Graham's testimony happened to corroborate Young's description of the transfer does not alter the fact that he could have rebutted Young's testimony. "We have never held that references to uncontroverted evidence which could have been controverted by someone other than the defendant will constitute reversible error." Kurina v. Thieret, 853 F.2d 1409, 1416 (7th Cir. 1988) (emphasis added). Thus, where a witness other than the defendant could have, but does not, contradict the government's proof, references to "uncontested" evidence are not improper. Id. This rule applies with equal force to eye-witness testimony provided by a law enforcement officer:

[T]his court has held that a reference to unrebutted testimony is not improper where police officers present at the arrest could have contradicted the government's theory.

United States v. Mietus, 237 F.3d 866, 872 (7th Cir. 2001) (emphasis added). We are convinced that the dissent is mistaken in its application of the law when stating that Harris was the only person who could have contradicted the government's theory concerning the transfer of money.

2. Application of the Harmless Error Doctrine

Even if we were to assume, arguendo, that the prosecutor's challenged comments were improper, Harris' claims do not satisfy the "impact" prong of the Renteria/Cusimano test and any alleged errors made by the prosecutor in this record were clearly harmless. After considering the prosecutor's comments taken in the context of the record as a whole, we are convinced that the comments did not have a "substantial and injurious effect or influence on determining the jury's verdict," Brecht, 507 U.S. at 637, and that the outcome of the trial would have been the same regardless of the prosecutor's alleged misconduct. Badger, 983 F.2d at 1456.

When assessing the prejudicial effect of improper remarks on the overall fairness of a trial, we place considerable emphasis on (1) the curative effect of

jury instructions, including those instructions regarding the government's burden to establish each and every element of the crime charged beyond a reasonable doubt, as well as the trial court's direct admonition that the arguments of the attorneys are not to be considered evidence, and (2) the weight of the evidence of guilt contained in the entire record. United States v. Cornett, 232 F.3d 570, 575 (7th Cir. 2000).

  With respect to the first factor (the jury instructions), after reviewing the jury instructions we are convinced that they were proper. In particular, we note that the trial court's instructions on the government's burden of proof were proper and furthermore the jury was clearly informed that the arguments of the attorneys are not evidence. "Absent evidence to the contrary, we presume that the jury understood and followed the district court's instructions." Cornett, 232 F.3d at 574. We have no reason to believe, nor does the record reflect, that the jury was left with a misunderstanding of the law, nor how it was to apply the law to the facts presented. It is interesting also to note that the jury had no questions before, during, or after deliberations, and defense counsel made no objection to the jury instructions at trial, nor on appeal does he allege any problem with the jury's ability to understand the instructions.

  As we have stated earlier, the weight of the evidence is overwhelmingly in favor of establishing Harris' guilt beyond a reasonable doubt, and the dissent's characterization of the evidence of his guilt as being "skimpy" is less than accurate. Levannon Berry Young, a participant in the transaction, provided first-hand testimony of the negotiations between himself and Harris, the exchange of money, and the eventual transfer of cocaine. His testimony also detailed the history of his drug dealings with Harris, as well as Harris' use of code language during all drug transactions. It is well known that drug dealers commonly use code language out of fear that their conversations will be intercepted:

Conversations regarding drug transactions are rarely clear. A fact-finder must always draw inferences from veiled

allusions and code words. In this case the jury was confronted with conversations which contained "code words" that, when considered in isolation, might seem unclear, veiled and almost nonsensical, but when analyzed properly, in the context of the totality of the evidence, can clearly be seen to be "code words" for drugs . . . . It is true that, advisedly, no explicit mention was ever made of cocaine or other drugs in any of Vega's conversations with the Zambranas. However, a case was made, which was more than strong enough to convince the jury, that Vega used terms like "chickens," "roosters" and "it" as code words for drugs. Not only are code words always used by drug conspirators when they realize, as they do in today's drug culture, that their telephone conversations are frequently intercepted, such term were obviously used by the conspirators in this case . . . . [W]e have frequently upheld conspiracy determinations made by judges and juries which have relied upon inferences that "code words" or obscure language were meant to refer to drugs.

Vega, 860 F.2d at 795, 798 (citations and internal quotation marks omitted).

Furthermore, Young's testimony was corroborated by the tape recorded conversations between himself and Harris. As an example, the words "drugs" or "cocaine" are not contained in any of the recorded conversations. Furthermore, one listening to a tape of the recorded conversations would necessarily come to the conclusion that many of Harris' comments make little or no sense unless understood, as Young explained, as a code lingo for drugs. Young's testimony included his explanation of the code language on the tapes, how Harris's reference to "a deuce" was code for two ounces of cocaine and that "You know the story is for you to meet me on Eighteenth?" was code for Harris' refusal to sell the two ounces for any amount less than $1,800.

And let us once again make clear that it is not the prerogative of a federal appellate court to second-guess the jury's weighing of Young's testimony--the determination of his credibility is exclusively for the jury. See United States v. Muthana, 60 F.3d 1217, 1223

(7th Cir. 1995) ("Assessing a witness' credibility is a matter inherently within the province of the jury, and arguments concerning credibility are wasted on an appellate court.") (internal quotation marks omitted); United States v. Ramirez, 796 F.2d 212, 214 (7th Cir. 1986) ("An appellate court will not . . . assess the credibility of the witnesses.")

In addition to the tape recordings and Young's testimony, the government introduced further corroborative testimony through Detective Graham. According to the detective's eye-witness account, Young obtained $1,800 of police bait money and turned it over to Harris, who was observed receiving the money and placing it in his pocket. Shortly after returning from his final meeting with Harris, Young turned over two ounces of cocaine to the officers from the Springfield Police Department.

Another important piece of evidence against Harris was the fact that Young's testimony under oath detailing the actual transfer of cocaine was corroborated in the tape recorded conversation of the crucial meeting. The recording containing Harris' instructions to "look in the glove box," followed by Young's comment, "you spooked, man," and Harris' direction to "peep it," is particularly probative evidence of guilt when viewed through the lens of Young's testimony describing the transfer of cocaine. If, as the dissent suggests, "Harris could have told Young to look in the glove box for any number of reasons," why did the two men deliberately fail to discuss the content of the glove box in any manner other than in code language referring directly to the drug transaction: "peep it" (examine it) "it's on the knob" (the quantity is exactly two ounces)? The recorded conversation is obviously evidence that Young received the cocaine from Harris in the manner Young described, and we fail to understand and must disagree with the dissent's statement that the jury "could have determined that the conversation [regarding the glove box] was innocuous." In light of Young's explanation of the code language, we are convinced that the dissent's view is nothing but mere speculation unsupported in the record. We are a loss to understand the dissent's claim that Harris' direction to Young to "look in the glove box" was in any way

ambiguous, for the dissent has failed to offer any explanation or reasoning in support of an alternative interpretation of those five words. The law is clear that the prosecution's case need not answer all questions and remove all doubts "because that would be impossible; the proof need only satisfy reasonable doubt." Vega, 860 F.2d at 794. The government's proof "need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt. The trier of fact is free to choose among various reasonable constructions of the evidence." Id. (emphasis added). Further, "the existence of an innocent explanation does not foreclose a jury from finding guilt beyond a reasonable doubt. The jury [is] entitled to draw reasonable inferences from the conversations." Vega, 860 F.2d at 796. This rule of law applies with equal force to the dissent's speculation that Young could have obtained the cocaine from a source other than Harris, which we find to be unsupported in the record. In order for Young to have obtained the cocaine from some other phantom source, he would have had to obtain the drugs in an almost instantaneous time frame, in a secretive transaction. Moreover, the officers did a thorough search of Young for money and drugs very shortly before his receipt of the cocaine and none was found, making it highly unlikely that he purchased the cocaine from anyone other than Harris.

The recorded conversation regarding Harris' instructions to look in the glove box, when combined with (1) Young's first-hand testimony of the events leading up to and including the transfer of the drugs, (2) the transfer of cash to Harris witnessed by Detective Graham, (3) the fact that Young turned over almost exactly two ounces of cocaine shortly after the crucial meeting, corroborating his testimony that the men had made a deal for two ounces, or a "deuce," of cocaine, (4) Young's explanation of the sound recorded when the cocaine bags hit the recorder in his pocket, and (5) the readily understandable "coded" conversations discussing the sale of the cocaine, amount to very powerful evidence of Harris guilt.

We are aware that the trial was not

perfect, as is the case in most trials. But let us point out that the United States Constitution does not guarantee a perfect trial, only a fair trial. Michigan v. Tucker, 417 U.S. 433 (1974). Based on our review, we are convinced that Harris received a fair trial in light of the overwhelming weight of evidence of guilt combined with the court's clear and unambiguous instructions to the jury. The prosecutor's comments, if erroneous they were, constituted harmless error, and fell short of having a prejudicial effect on the jury.

B.   Admission of Uncharged Drug Transactions

Harris also claims that the trial judge improperly permitted the prosecution to introduce evidence of prior, uncharged drug transactions between himself and Young. We review a district court's evidentiary rulings for abuse of discretion./6 United States v. Menzer, 29 F.3d 1223, 1234 (7th Cir. 1994). A determination made regarding the admissibility of evidence by the trial judge "is treated with great deference because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding." United States v. Wash, 231 F.3d 366, 371 (7th Cir. 2000).

The judge permitted Young to testify that in the five year period preceding trial, Harris sold Young three to four ounces of cocaine on eight or nine different occasions. Young's testimony regarding these uncharged drug sales included a description of Harris' procedures for communication, the exchange of money, and the delivery of the drugs. According to the trial judge:

In the instant case, the Government has indicated that it will seek to admit audio tapes of conversations between Defendant and Young. In these conversations, Defendant allegedly uses highly veiled language to refer to the prices which he charges for two ounces of cocaine. As the Government notes, the only way for the Government to explain to the jury the significance of this

language is to allow Young to testify that he understood this veiled language to refer to drug transactions because he has been involved in drug transactions with Defendant in the past. As such, the evidence of Defendant's prior drug transactions with Young completes the story of the crime with which Defendant has been charged and is so connected that it explains the circumstances surrounding the charged crime. (emphasis added).

We agree with the trial judge's ruling that the evidence was admissible under the "intricately related" doctrine. "This Circuit has a well-established line of precedent which allows evidence of uncharged acts to be introduced if the evidence is 'intricately related' to the acts charged in the indictment." United States v. Ryan, 213 F.3d 347, 350 (7th Cir. 2000), quoting United States v. Gibson, 170 F.3d 673, 690 (7th Cir. 1999). Under the "intricately related" doctrine, the admissibility of Harris' uncharged criminal activity turns on:

whether the evidence is properly admitted to provide the jury with a complete story of the crime [on] trial, . . . whether its absence would create a chronological or conceptual void in the story of the crime, . . . or whether it is so blended or connected that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime.

Ryan, 213 F.3d at 350, quoting United States v. Ramirez, 45 F.3d 1096, 1102 (7th Cir. 1995) (citations omitted).

We are of the opinion that Young's testimony concerning the defendant Harris' usual modus operandi for the sale of drugs was properly admitted in evidence. If the court had declined to allow the receipt of this detailed explanation of Harris' drug transactions, including the negotiations, the purchase, the transfer of the cocaine, and the use of code language, the jury would have been left with a somewhat confusing and incomplete picture.
Young's testimony regarding prior uncharged criminal drug activity qualified for admission under the three Ramirez scenarios. The evidence "completes the story of the crime," its absence would create a "conceptual void,"

and the evidence is "so blended" with the charged offense that it explains the surrounding circumstances. Evidence need only satisfy one prong under Ramirez in order to be admissible, and the contested evidence in this case satisfies all three prongs. We are convinced that the evidence was admissible under the intricately related doctrine.

Harris's conviction and sentence are

AFFIRMED.

FOOTNOTES

/1 Young was on parole for prior drug violations at the time of the raid and one of the stipulations in his parole agreement provided that he was not to associate with any known criminal (i.e. Jill Nelson or Marcus Harris). Young's agreement to cooperate could have been motivated by his desire to avoid a return to the confines of a prison surrounding.

/2 Young explained that Harris thought he had seen the car of a store employee named "Sam" who had recently been charged in a federal drug case.

/3 We have previously held that "matters of public record such as . . . city ordinances . . . are proper subjects for judicial notice." Newcomb v. Brennan, 558 F.2d 825, 829 (7th Cir. 1977); see also Matter of Waller Creek, Ltd., 867 F.2d 228, 238 n.14 (5th Cir. 1989) (taking judicial notice of ordinances not considered by district court); Allred v. Svarczkopf, 573 F.2d 1146, 1151 (10th Cir. 1978) (same); Bryant v. Liberty Mut. Ins. Co., 407 F.2d 576, 579-80 (4th Cir. 1969) (same). The name change mandated in the Springfield ordinance, reproduced in the body of this opinion, occurred over 14 years prior to the date of the drug transaction involved in this case, and over 16 years prior to the negligent, offhand remarks made in United States v. McClain, No. 01-1740, on which the dissent relies for its assault on the evidence. The dissent is thus incorrect in stating that the two witnesses testifying in this case about the designated location at Harris' trial gave "inaccurate" testimony when stating that there is no street designated "Eighteenth Street" in Springfield, Ill.

/4 "The reason we require a determination on the record is that we think fair procedure in resolving disputes of adjudicative facts calls for giving each party a chance to meet in the appropriate fashion the facts that come to the tribunal's attention . . . [through] rebuttal evidence, cross-examination, usually confrontation,

and argument (either written or oral or both)."
Fed. R. Evid. 201(b) advisory committee notes
(1972). It is eminently clear that the record in
this case is barren of any information from which
the jury could have inferred that a reference to
"Eighteenth Street" was part of the "common
parlance" of law-abiding Springfieldresidents in
November 1998.

/5 We believe that the dissent's unsupported
argument is less than helpful to the enrichment
of the law, and nothing in this opinion should
encourage future litigants to base their appel-
late argument on materials outside the record and
not presented to the district court. See Zell,
542 F.2d at 38 (citing Paridy v. Caterpillar
Tractor Co., 48 F.2d 166, 168 (7th Cir. 1931)).

/6 Given the judge's definitive ruling on Harris'
motion in limine concerning this issue, there was
no need for the defendant to renew his objection
at trial in order to preserve the issue for
appellate review. Wilson v. Williams, 182 F.3d
562, 564 (7th Cir. 1999) (en banc) ("a definitive
ruling in limine preserves an issue for appellate
review--without the need for later objection.").

   DIANE P. WOOD, Circuit Judge, dissenting.  Marcus
Harris stood trial on a single charge of unlaw-
fully distributing cocaine--not conspiring to
distribute cocaine, not possessi bng a controlled
substance with intent to distribute it. This
means that the government was obliged to prove,
beyond a reasonable doubt, that he committed this
particular crime. The majority spends a great
deal of time and energy arguing forcefully that
the evidence before the jury wassufficient to
support a conviction on the distribution charge.
If that was what this appeal was about, I would
agree that the evidence taken in the light most
favorable to the jury's verdict would easily
support an affirmance. But that is not Harris's
argument on appeal. Instead, his principal point
is that the prosecutor made comments that violat-
ed his right to a fair trial, and these errors
were so serious that he is entitled to a new
trial. Even taking into consideration the demand-
ing plain error standard of review Harris faces,
I am persuaded that he is right. I would reverse
Harris's conviction and remand for a new trial,
and I therefore respectfully dissent.

   The statements Harris challenges are set out in
the majority opinion. As my colleagues essential-
ly acknowledge, the government has conceded that
at least some of them were improper. Ante at 14.
Nevertheless, both because this court has an

independent obligation to assess the propriety of any such confession of error, and because affirmance would be required if the statements were not improper, I consider the propriety question first, and then the question of the impact of any improprieties on the trial as a whole. This is in keeping with the usual test that is applied to plain error review of prosecutorial misconduct under cases like United States v. Renteria, 106 F.3d 765 (7th Cir. 1997), to which the majority refers ante at 12: first we consider whether the challenged remarks were improper; if they were, we then consider them in context and ask whether they denied the defendant a fair trial. Renteria,106 F.3d at 766.

First is the prosecutor's reference--two times-- to portions of the government's evidence as "unrebutted" or "not contested." The Fifth Amendment forbids prosecutors from inviting the jury to draw an adverse inference from a defendant's decision not to testify. Griffin v. California, 380 U.S. 609 (1965). This rule prohibits indirect as well as direct comments to this effect. United States v. Aldaco, 201 F.3d 979, 987 (7th Cir. 2000). As the majority points out, indirect requests to draw adverse inferences from the defendant's silence violate the Fifth Amendment only if (1) the prosecutor manifestly intended to refer to the defendant's silence or (2) a jury would naturally and necessarily take the remark for a comment on the defendant's silence. United States v. Mietus, 237 F.3d 866, 871 (7th Cir. 2001). However, this court has repeatedly held that, if a prosecutor points out that certain evidence is "unrebutted" or "uncontested," and if the only person who could reasonably be expected to rebut the evidence is the defendant himself, then such comments naturally and necessarily call the jury's attention to the defendant's failure to testify. See, e.g., Mietus, 237 F.3d at 871; Aldaco, 201 F.3d at 987; United States v. Cotnam, 88 F.3d 487, 497 (7th Cir. 1996) (collecting cases). Essentially, these cases carve out a narrow class of comments that refer indirectly to the defendant's failure to testify--remarks that testimony is unrebutted when only the defendant could have supplied a rebuttal--and hold that this type of comment always naturally and necessarily involves a comment on the defendant's silence.

Both of the statements Harris challenges ran afoul of this rule. The first statement referred back to Berry Young's testimony that Harris backed out of the drug deal at the Citgo because Harris was concerned that "Sam," a man who had recently been arrested for selling drugs and who might be cooperating with the police, was there. In his closing, the prosecutor argued that "[t]he

explanation given by Berry Young [for why Harris backed out of the deal] is absolutely unrebutted in this case." But here the prosecutor could only have been talking about Harris's thoughts or frame of mind, because the question was why Harris decided not to go ahead with the deal. No matter how reasonable Young's guess may have been about Harris's mental processes, the fact remains that no third party, including an expert in drug lingo, reasonably could have rebutted Young's testimony except for Harris himself.

Second, the prosecutor described the incident in which a government agent watched Young give Harris $1800 and concluded that this testimony was "not contested." But according to the government's own witnesses, only three people witnessed the alleged exchange of money--Young, Harris, and Agent Graham. Young and Agent Graham both testified that Young gave Harris the money. The only conceivable person who could have supplied the "contest" the prosecutor claimed was missing was again Harris himself. The majority's reliance on Kurina v. Thieret, 853 F.2d 1409 (7th Cir. 1988) is misplaced, since in that case other witnesses, not called by either party, could have countered the testimony of prosecution witnesses. Id. at 1416. It makes no difference whether there were three witnesses to the drug transaction or thirty; if all but the defendant testify for the prosecution, then the only person who can credibly testify in rebuttal is the defendant. Because Harris was the only person who could have rebutted both the "Sam" evidence and the fund transfer evidence, the prosecutor's statements that the evidence on these points was "unrebutted" or "not contested" were improper.

Next, Harris challenges the prosecutor's references to his courtroom demeanor. At the end of his initial closing argument, the prosecutor asked the jury: "What's been the defendant's manner during this trial? Cocky, like it's a joke. You'll never catch me. I'm too careful. But not careful enough." The majority does not discuss the propriety of these statements, but the government has conceded that they were error. A review of the caselaw in this area amply demonstrates the correctness and wisdom of that concession. The Supreme Court has held that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on [the basis of] . . . circumstances not adduced as proof at trial." Taylor v. Kentucky, 436 U.S. 478, 485 (1978). Several circuits have applied this rule to hold that prosecutorial comments on the defendant's courtroom demeanor are improper. See, e.g., United States v. Gatto, 995 F.2d 449, 455 (3d Cir. 1993); United States v. Schuler, 813

F.2d 978, 979 (9th Cir. 1987); United States v. Pearson, 746 F.2d 787, 796 (11th Cir. 1984). I am convinced that this outcome is correct and would join our sister circuits in this holding. See also Gomez v. Ahitow, 29 F.3d 1128, 1136 (7th Cir. 1994) (citing this reasoning with approval, although deciding case on other grounds).

Finally, and most seriously, the prosecutor made a statement during his rebuttal argument that improperly distorted the burden of proof in this case. In the passage to which Harris objects, the prosecutor stated:

Absent any reasonable alternative explanation for the defendant's comments to Berry Young that the government says related to drugs, if that is the only reasonable explanation was that Berry Young asked--the defendant said he had a deuce, two, and Berry Young says will you sell it to me for 18, 1800, Eighteenth Street, and the defendant says, "I'll do that for you, I'll do that for you," and in fact Berry Young is seen by Detective Graham giving $1800 to the defendant, and then the defendant--and then after meeting with the defendant the next time after that Berry Young comes back with two ounces, if there is no other reasonable explanation for those statements than that given by Berry Young, there is no reasonable doubt about where Berry Young got those two ounces.

Statements that suggest incorrectly what the jury must find in order to reach a certain verdict distort the burden of proof and are therefore improper. See United States v. Cornett, 232 F.3d 570, 574 (7th Cir. 2000); United States v.Vargas, 583 F.2d 380, 386 (7th Cir. 1978). The statement quoted above created just such a distortion. According to it, unless there was a reasonable alternative explanation of the meaning of the recorded conversations, there could be no reasonable doubt as to whether Harris distributed the drugs. But this is plainly not true; it assumes that evidence of negotiations and evidence of final delivery are one and the same thing, and they are not. Harris's strongest argument was that, even if the tapes showed that he and Young were negotiating a drug deal, there was no proof that Harris actually delivered the drugs rather than backing out at the last minute. Furthermore, as I explain below in more detail, the government had no way of showing for certain that Harris was the source of whatever drugs Young got. For the government to tell the jury that it had to convict unless it could find an innocent explanation for the negotiating conversations was a misstatement of the government's burden of proof./1

The prosecutor, in short, made not one but several seriously improper remarks in his closing argument. This makes it necessary for me to consider the question whether these remarks, viewed in the light of the record as a whole, deprived Harris of a fair trial. As the majority correctly notes, the focus of this inquiry is whether the evidence against the defendant was so overwhelming that it is clear that he would have been convicted even absent the improper remarks. See United States v. Hasting, 461 U.S. 499, 510-11 (1983). The answer, I believe, is no: while the government certainly had enough evidence against Harris to sustain a conviction, once again that is not the issue. We must consider instead whether no other conclusion was possible for this jury. On that point, a close look at the evidence of actual delivery of the drugs reveals that the government's case was not nearly as airtight as the majority claims it is. To the contrary, as I indicate below, there were significant gaps, and a reasonable jury viewing the case without the distortions introduced by these errors could also have concluded that the government failed to prove that Harris transferred the drugs to Young.

We all agree that the government presented overwhelming evidence that Harris negotiated with Young to sell Young several ounces of cocaine. Although both parties have made much of the "veiled" language Harris and Young used to conduct their negotiations, I find the coded language on the tapes rather transparent, and I have no trouble believing that any rational jury, hearing those tapes, would have concluded that the two were indeed negotiating for the sale of drugs. If the government had only to prove that Harris negotiated to sell drugs, once again affirmance would be in order.

Where, however, is the evidence that Harris actually delivered the two ounces of cocaine to Young? On this critical point, the government's evidence was scant. We know from Young's own testimony that Harris was skittish about selling drugs and that he typically abandoned a deal if he sensed anything was amiss. We also know, again from Young's own interpretation of the taped conversations, that Harris had already pulled out of a deal with him earlier in the day. Against that background, we know that Young went to a barber shop to meet Harris, at Harris's request. Government agents accompanied Young to the barber shop, but they parted ways before they got there and left him entirely unattended. (They explained that it was too dangerous to maintain visual surveillance of Young during the key moments when Harris allegedly provided the drugs to him.) As Young told the story, he and Harris walked to the

parking lot to look at Harris's new truck. After discussing the truck for a few minutes, Harris instructed Young to "look in the glove compartment." The two talked for a little while longer about the truck's paint job, and Harris then said, "Peep it man. It's tight, it's on the knob. I'm thinkin' about sellin' it." Young later returned to the agents with two ounces of cocaine, testifying at trial that he found the drugs in the glove compartment, and that the references to something being "tight" and "on the knob" meant that the cocaine weighed two ounces exactly. Although this testimony, if believed, was certainly sufficient to convict Harris, this portion of the case ultimately rests entirely on Young's word. The references to something being "tight" and "on the knob" could easily have referred to drugs, as Young said they did, but they were ambiguous enough that they could also have described something else. Similarly, Harris could have told Young to look in the glove compartment to retrieve any number of legal items that people commonly store there, such as the car's title and registration. In short, although the recorded conversation easily could be interpreted as Young suggested, the jury also reasonably could have determined that the conversation was innocuous.

The majority's suggestion that it is quite unlikely that Young could have acquired the drugs in any other way--as the opinion puts it, "from some other phantom source . . . in an almost instantaneous time frame, in a secretive transaction" ante at 21, overlooks important parts of the record. The trial testimony makes it apparent that Young had ample opportunity and time to obtain the two ounces of cocaine from someone other than Harris. When the officers and Young began this operation on the morning of November 11, the officers searched Young and his car and found no money or drugs. After that, however (and assuming that this search accurately revealed that Young had no money or drugs at that time), several hours elapsed before Young finally returned to the officers with the drugs that afternoon. During that time, Young was frequently out of the officers' visual surveillance. Although the officers searched Young's person again, they never again searched his car. Young had recording devices with him for much of that time, but not all of it. At least once, Young left the recording device in the car, when he left it to go into the Citgo station where he was to meet Harris. Furthermore, despite the officers' testimony that Young had neither drugs nor money at the time of their search of him, Young testified that later in the day he bought spicy chicken wings at the Citgo. This testimony suggests that the officers either missed some money Young had, or he managed

to acquire money after their inspection. Either way, if he could have acquired money (in a "secretive" transaction not recorded on the tapes), then he could also have acquired drugs.

None of this is to say that Young necessarily acquired the drugs he provided to the agents anywhere other than from Harris, as he said he did. It only illustrates that Young had ample opportunity to acquire the drugs elsewhere if he had wanted to set Harris up. Young also had ample motive to do so, as he had agreed to cooperate with the government in its investigation of Harris after the government caught Young himself with drugs. Young was under some pressure, because he had been unsuccessful in purchasing drugs from Harris in any of their first few meetings. Harris's counsel argued at trial that, although Harris may have negotiated to sell drugs to Young, he ultimately did not do so. Although the jury obviously was not bound to accept this story, the evidence in the record could have supported it.

Against this backdrop, the government's improper closing argument may well have prejudiced Harris. First, the prosecutor's statement that "if there is no other reasonable explanation for [the recorded conversations] other than that given by Berry Young, there is no reasonable doubt about where Berry Young got those two ounces," directly addressed the central weakness in the government's case and instructed the jury to ignore that weakness. That error alone might be enough to warrant reversal. But there is much more. The prosecutor's statements that the defendant's demeanor during the trial was "cocky, like it's a joke" and that the defendant thought the government would never catch him because he was "too careful" are also very troubling, especially given that Young testified in detail as to his history of drug deals with Harris. The prosecutor's reference to Harris's demeanor invited the jury to convict Harris based on the fact that he is a cocky, sneaky drug dealer, rather than focusing on whether the government had sufficiently proved that Harris actually distributed drugs in this case. When these errors, along with the prosecutor's repeated improper references to Young's "unrebutted" interpretation of the taped conversations, are viewed together, I cannot say that the combined weight of the errors did not improperly influence the jury's decision to convict Harris, despite the court's generic instructions on burden of proof. I would reverse and remand for a new trial, and I therefore respectfully dissent.

FOOTNOTE

/1 The majority comments that the reference to 18th Street in Springfield must have been code for a drug transaction, because, it says, "[t]estimony at trial from Young and an FBI Agent established that there [is] no street designated as 'Eighteenth Street' in Springfield, Illinois." Ante at 4, n.3. In fact, the situation is not so simple. As the ordinance the majority supplies makes clear, there is no longer a street in Springfield that bears the formal name "Eighteenth Street." But, as is often the case with street re-namings, it turns out that in common parlance the old name has not died away. It is striking that in another appeal filed in this court, United States v. McClain, No. 01-1740, the brief for the United States contains the following assertion with respect to streets in Springfield, Illinois: "Eric Jackson stopped at a stop sign at the corner of Eighteenth and Edwards Street." Brief of Plaintiff-Appellee at 3. The brief for the defendant-appellant in that case twice refers to an Eighteenth Street in Springfield. First, it reports that "Officer Anderson, while on routine patrol on April 23, 2000 near the intersection of 18th Street and Cook Street in Springfield, Illinois, observed two men fighting on the side of the road." Brief and Argument of Defendant-Appellant at 6. Later, it says "[a]s Jackson approached the stop sign at 18th and Edwards, he saw Defendant-Appellant." Id. at 8. While someone consulting the Internet map source MapQuest (http://www.mapquest.com) would find only South Martin Luther King, Jr. Drive between South 17th Street and South 19th Street, the alternative map source MapBlast! (http://www.mapblast.com) shows the exact same street as 18th Street. Local newspapers also appear to refer to the street as 18th Street at times. See, e.g., Police Beat, State Journal-Register (Springfield), July 9, 2001, at 16, available at 2001 WL 23495817 (reporting that a Springfield resident "told police Saturday night that a 27-year-old man, whose name he didn't know, crawled onto the front porch of his home in the 1000 block of South 18th Street after the 27-year-old had been beaten"); UIS Weekly, January 8, 2001, at 1, available at http://www.uis.edu/weekly/jan08.pdf (reporting on Annual Unity Day and directing marchers to go to a particular staging area and "then proceed west to Pilgrim Rest Missionary Baptist Church, 1800 South 18th Street, Springfield"). Naturally, if Harris did not take issue with the plainly inaccurate statement about 18th Street at trial, there is little that we as an appellate court could or should do here. But it further suggests that the evidence was not so overwhelming as the majority paints it to be.